433 A.2d 5

In re INVESTIGATING GRAND JURY OF
PHILADELPHIA COUNTY.

**Appeal of Richard DRAPCZUK.**

■■■■■■■■■■■■■■

Argued April 21, 1981.
Decided July 31, 1981.

Holly Maguigan, Philadelphia, for appellant.

Robert B. Lawler, Jane Greenspan, Philadelphia, for appellee.

## OPINION OF THE COURT

ROBERTS, Justice.

Petitioner Richard Drapczuk was subpoenaed by an investigating grand jury and granted immunity for his testimony. When he refused to testify, the supervising judge, after a hearing, entered an order of civil contempt against him.

Petitioner asserts that his contempt citation should be reversed because, in his view, the record does not support a finding that the grand jury requested the court to initiate contempt proceedings. We reject this theory and affirm.[1]

### I

It has never been disputed that

---

1. This case was reassigned to this writer on July 15, 1981.

    In the same investigating grand jury proceeding, contempt orders were entered against David Bohannon and Richard Wolf. Petitioner

> "[e]mbedded in Anglo-American law is the inherent power of the judiciary to coerce obedience to its orders by summarily holding a recalcitrant person—such as an immunized witness who refuses to testify at a grand jury proceeding or at a trial—in civil contempt, and then imprisoning him until he complies."

*In Re Grand Jury Investigation*, 600 F.2d 420, 422 (3d Cir. 1979) (footnote omitted). In affirming an order of civil contempt entered against an immunized witness who refused to testify before an investigating grand jury, this Court has stated, " 'There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt.' " *In Re Martorano*, 464 Pa. 66, 77, 346 A.2d 22, 27 (1975), quoting *Shillitani v. United States*, 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622, 627 (1966).

■ Civil contempt has long been recognized as the appropriate means by which a court may compel compliance with its orders. *Woods v. Dunlop*, 461 Pa. 35, 40 n.2, 334 A.2d 619, 622 n.2 (1975) (citing cases). Whether to issue a contempt citation to enforce a court order has always been a decision for the court. *Aungst Contempt Case*, 411 Pa. 595, 599, 192 A.2d 723, 725 (1963).

■ Here, the supervising judge issued a contempt citation to enforce his previous orders which had denied petitioner's motion to quash the grand jury's subpoena and had granted use immunity to petitioner. These two earlier court orders, with which the contempt citation directed petitioner to comply, were issued to enforce the grand jury's own command, made through subpoena, that petitioner testify in response to questions.

Drapczuk, like those petitioners, argues that his contempt citation entered in the grand jury proceeding violates the fifth amendment privilege against self-incrimination. Today, the Court rejects that argument in the cases of Bohannon and Wolf and affirms their contempt citations. *In Re Investigating Grand Jury of Philadelphia County: Appeals of David Bohannan and Richard Wolf*, 495 Pa. 211, 433 A.2d 18 (1981) (per curiam). We also reject petitioner Drapczuk's argument to this effect.

Petitioner asks this Court to abrogate the traditional authority of the court to enforce a court order upholding the validity of a subpoena and a court order of immunity. The sole support for petitioner's argument is his reading of 42 Pa.C.S. § 4548(a), formerly 19 P.S. § 271, (Act of November 22, 1978, P.L. 1148, No. 271 as amended, Act of July 20, 1979, P.L. 153, No. 50), which sets forth the powers of the investigating grand jury:

"(a) General rule—The investigating grand jury shall have the power to inquire into offenses against the criminal laws of the Commonwealth . . . . Such power shall include the investigative resources of the grand jury which shall include but not be limited to the power of subpoena, the power to obtain the initiation of civil and criminal contempt proceedings, and every investigative power of any grand jury of the Commonwealth. . . ."

Petitioner argues that the Court should interpret 42 Pa.C.S. § 4548(a) as an exclusive grant of authority to the grand jurors to initiate contempt proceedings.

This interpretation must be rejected. As the language of 42 Pa.C.S. § 4548(a) plainly demonstrates, the statute in no respect provides, even implicitly, that the powers set forth are either exclusive to the grand jury or intended to displace valid, fundamental powers of the court.

The court's fundamental power to initiate contempt proceedings, even without a request to do so by the grand jury, is evident from the statute governing immunity of witnesses, 42 Pa.C.S. § 5947. The immunity statute draws no distinction between proceedings before investigating grand juries and proceedings before courts, grand juries, the minor judiciary or coroners. To all these proceedings, the same standards specifically apply: "immunity orders shall be available," § 5947(a); the "judge shall issue such an order," § 5947(b); whenever "the person presiding at such proceeding communicates to the witness an immunity order, that witness may not refuse to testify based on his privilege against self-incrimination," § 5947(c); "[a]ny person who

shall fail to comply with an immunity order may be adjudged in civil contempt," § 5947(e); and, "[i]n addition to civil contempt . . . any person who shall fail to comply with an immunity order shall be guilty of criminal contempt," § 5947(f).[2]

Thus, 42 Pa.C.S. § 5947 recognizes that a judge has full power to enforce his orders of immunity through a finding

**2.** 42 Pa.C.S. § 5947 provides in relevant part:
"§ 5947. Immunity of witnesses
  (a) General rule.—Immunity orders shall be available under this section in all proceedings before:
    (1) Courts.
    (2) Grand juries.
    (3) Investigating grand juries.
    (4) The minor judiciary or coroners.
  (b) Request and issuance.—The Attorney General or a district attorney may request an immunity order from any judge of a designated court, and that judge shall issue such an order, when in the judgment of the Attorney General or district attorney:
    (1) the testimony or other information from a witness may be necessary to the public interest; and
    (2) a witness has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self-incrimination.
  (c) Order to testify.—Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding specified in subsection (a), and the person presiding at such proceeding communicates to the witness an immunity order, that witness may not refuse to testify based on his privilege against self-incrimination.

  (e) Civil contempt.—Any person who shall fail to comply with an immunity order may be adjudged in civil contempt and committed to the county jail until such time as he purges himself of contempt by complying with the order, except that with regard to proceedings before grand juries or investigating grand juries, if the grand jury before which a person has been ordered to testify has been dissolved, he may then purge himself of contempt by complying before the designated court which issued the order.
  (f) Criminal contempt.—In addition to civil contempt as provided in subsection (c), any person who shall fail to comply with an immunity order shall be guilty of criminal contempt, and upon conviction thereof, shall be sentenced to pay a fine of not more than $1,000 or to undergo imprisonment for a period of not more than one year, or both.
  (g) Definitions.—. . .
    'Immunity order.' An order issued under this section by a designated court, directing a witness to testify or produce other information over a claim of privilege against self-incrimination."

of civil contempt in all proceedings where an order of immunity is permissible, and provides that, in all such proceedings, failure to comply with an immunity order shall constitute criminal contempt.

The investigating grand jury statute, 42 Pa.C.S. § 4548(a), supplements 42 Pa.C.S. § 5947 by providing that an investigating grand jury has authority to request the court to exercise its contempt power. However, neither by language nor by reasonable implication does 42 Pa.C.S. § 4548(a) condition the court's exercise of its section 5947 contempt power upon such a request. See 1 Pa.C.S. § 1932 (related statutes to be read in pari materia).

## II

■ Petitioner's argument that contempt proceedings may be initiated only upon request by the grand jury not only is contrary to the fundamental principle that a court has inherent power to enforce its own orders, but also is irreconcilable with the realities of an investigating grand jury proceeding.

When the supervising judge denied petitioner's motion to quash the grand jury's subpoena, he thereby sustained the subpoena's validity. At the hearing on the motion to quash, the Commonwealth, as the representative of the grand jury, had the burden of satisfying the test recently adopted by this Court in *Robert Hawthorne, Inc. v. County Investigating Grand Jury*, 488 Pa. 373, 412 A.2d 556 (1980). There, this Court held that, upon challenge of a grand jury subpoena, that subpoena may be enforced by the court only upon a preliminary showing by affidavit that the information sought from the witness is relevant to an investigation by the grand jury properly within the grand jury's jurisdiction, and that the information is not sought primarily for another purpose. *Hawthorne*, supra, 488 Pa. at 382–83, 412 A.2d at 560–61. Accord, *In Re Grand Jury Proceedings (Schofield)*, 486 F.2d 85 (3d Cir. 1973).

Having lost on his *Hawthorne* claim at the hearing below, petitioner impermissibly seeks to avoid review by this Court

of the validity of the subpoena based on the standards adopted in *Hawthorne.* Cf. *In Re Petition of Arlen Specter,* 455 Pa. 518, 317 A.2d 286 (1974) (witness may not use writ of prohibition to circumvent direct appeal for review of denial of motion to quash grand jury subpoena). Thus, petitioner asks this Court to adopt the presumption that a grand jury, after having issued a subpoena and after having successfully defended its validity, does not intend the subpoena to be enforced.

A presumption that a grand jury does not intend its subpoenas to be enforced would defy common sense; it would also conflict with two fundamental principles that have always governed grand jury proceedings. First, a presumption of non-enforcement would conflict with the "presumption of regularity [which] attaches to the grand jury's proceedings, and hence to a grand jury subpoena." *In Re Grand Jury Proceedings (Schofield),* 486 F.2d 85, 92 (3d Cir. 1973). Accord, *Robert Hawthorne, Inc. v. County Investigating Grand Jury,* supra (adopting *Schofield* standard as matter of state law); *Robert Hawthorne, Inc. v. Director of Internal Revenue,* 406 F.Supp. 1098 (E.D.Pa.1976). Second, a presumption of non-enforcement would conflict with "the historic requirement in Pennsylvania that *a court* be placed in charge of a special investigating grand jury to regulate the scope of inquiry . . . ." *Commonwealth v. McCloskey,* 443 Pa. 117, 134, 277 A.2d 764, 773, cert. denied, 404 U.S. 1000, 92 S.Ct. 563, 30 L.Ed.2d 552 (1971) (emphasis in original). Thus, it has always been held that the court has the obligation to supervise the investigating grand jury, and not, as petitioner argues, the reverse.[3] See, e. g., *In Re Investigating Grand Jury of Philadelphia County,* 490 Pa. 31, 415 A.2d 17 (1980); *In Re June 1979 Allegheny County Investigating Grand Jury,* 490 Pa. 143, 415 A.2d 73 (1980) (plurality opinion); *Pirillo v. Takiff,* 462 Pa. 511, 341 A.2d 896 (1975),

**3.** Indeed, the potential for abuse of an investigative grand jury's power has been recognized as "the prime motivation" for "the historic requirement" that an investigating grand jury be judicially supervised from its inception. *Commonwealth v. McCloskey,* supra, 443 Pa. at 134, 464 A.2d at 773.

cert. denied, 423 U.S. 1083, 96 S.Ct. 873, 47 L.Ed.2d 84 (1976); *Commonwealth v. McCloskey,* supra; *McNair's Petition,* 324 Pa. 48, 187 A. 498 (1936). Accord, e. g., *Levine v. United States,* 362 U.S. 610, 80 S.Ct. 1038, 4 L.Ed.2d 989 (1960); *Cobbledick v. United States,* 309 U.S. 323, 60 S.Ct. 540, 84 L.Ed. 783 (1940).

## III

Petitioner's theory of relief not only is unsupported by law or public policy, but also is unsupported by the record. On June 1, 1981, at the close of its twenty-four month term of service, the investigating grand jury submitted its final report to the supervising judge. In that report, accepted by the court and filed as a public record pursuant to 42 Pa.C.S. § 4552, the grand jury states:

"On September 9, 1980, we issued a presentment charging four employees, David Bohannon, Richard Drapczuk, John Majewski and Richard Wolf with participation in the conspiracy to defraud the City.

Our investigation continued after charges were filed against the four individuals. Our goal was to determine whether other Mrs. Paul's employees, higher in the corporate structure, were involved in the scheme to defraud the City.

To that end, in late March, 1981, the four individuals who had been charged were subpoenaed to appear before us and were subsequently granted immunity.

In April, each of the four appeared before us. It was our desire to hear their testimony. However, despite the immunity grants, three of the individuals refused to answer questions and were held in contempt by Judge David Savitt, the Supervising Judge. Judge Savitt ordered that these individuals be jailed until they agreed to testify or until our term expired, whichever occurred first." [4]

In addition to expressing the grand jury's "desire to hear their testimony," the grand jury report further characterizes

4. Final Report of the June 1, 1979 Philadelphia County Investigating Grand Jury at 8.

all the witnesses who refused to testify, including petitioner Drapczuk, as "recalcitrant" and states that "our investigative goal has been totally frustrated." [5]

Thus, petitioner Drapczuk's argument that the order adjudging him in contempt of court should be reversed because of an asserted void in the record regarding the desire of the grand jury to hear his testimony is defeated by the grand jury's own words.

## IV

■ Because the grand jury must be presumed to intend that its subpoenas be enforced, because the investigating grand jury report evinces such an intent, and because the court has unquestionable authority to compel compliance with its enforcement orders, the supervising judge entered a valid order adjudging petitioner Drapczuk in contempt of court.

Here, as in the cases of Bohannon and Wolf, the order of civil contempt is affirmed.

O'BRIEN, C. J., and KAUFFMAN, J., did not participate in the consideration or decision of this case.

LARSEN, J., filed a dissenting opinion.

LARSEN, Justice, dissenting.

Because of the denial to the investigating grand jury, by the majority, of the ability to safeguard an individual against possible abuse of its awesome powers by the prosecution, and because of misrepresentations by the majority as to the record in this case, I dissent.

On June 22, 1979, the Honorable David N. Savitt, Court of Common Pleas of Philadelphia County, accepted for submission to the June 1, 1979 Investigating Grand Jury of Philadelphia County an investigation into alleged tampering with water pollution monitoring and sampling equipment at Mrs. Paul's Kitchens, Inc. (Mrs. Paul's). After 15 months of

5. Id. at 9.

investigation, the grand jury issued a presentment against, *inter alia*, Richard Drapczuk, petitioner herein, David Bohannon and Richard Wolf, petitioners at Nos. 184 and 187 E.D.Misc.Dkt.1981, recommending that each be charged with theft of services (18 Pa.C.S.A. § 3926), unsworn falsification (18 Pa.C.S.A. § 4904), obstructing the administration of law (18 Pa.C.S.A. § 5101), conspiracy (18 Pa.C.S.A. § 903), and corrupt organizations (18 Pa.C.S.A. § 911). Following five days of preliminary hearing, petitioners were held over for court on these charges on March 9, 1981.

Petitioner Drapczuk, whose trial was scheduled for June 8, 1981, was subpoenaed before the grand jury on February 23, 1981, ostensibly to inquire about possible involvement in the alleged conspiracy by Drapczuk's superiors. He presented a motion to quash the subpoena to Judge Savitt, the supervising judge of the grand jury, which motion was denied on March 26, 1981. Having been informed of Drapczuk's intention to refuse to testify before the grand jury on self-incrimination grounds, the Commonwealth petitioned Judge Savitt for a grant of immunity pursuant to section 5947 of the Judicial Code, 42 Pa.C.S.A. § 5947, which petition was granted on March 30, 1981 over petitioner's objection.

After being sworn before the grand jury on that same day, Drapczuk read a prepared statement to the jury in which he declined to answer any questions. His reasons set forth in that statement were, essentially, that the immunity order of Judge Savitt was, under the facts of his case, insufficient to safeguard his Fifth Amendment privilege against self-incrimination because of prior abuse by the same prosecutors of grand jury testimony in a criminal trial also stemming from the Mrs. Paul's investigation (in the case of one Gary Zanecosky). The statement explained to the grand jury its obligation to protect the individuals who come before it from such asserted abuse, and requested the grand jury to refuse to ask questions and to refuse to obtain the initiation of contempt proceedings against him. After refusing to answer questions propounded by the prosecutor, Drapczuk and his counselor left the grand jury room while

the grand jury presumably discussed Drapczuk's statement with the prosecutors. (Although the court stenographer apparently recorded the discussion between the prosecutors and the grand jury, the record of the contempt proceeding does not disclose what actually transpired before the grand jury after Drapczuk left the room.)

A contempt proceeding was then held before Judge Savitt, also on March 30th. At this hearing, counsel for Drapczuk attempted to make a record concerning the grand jury deliberations while she and her client were outside of the grand jury room. Her offer of proof was that the record would reveal whether the grand jury had requested the prosecutor to obtain the initiation of contempt proceedings, arguing that without such a request it was improper for the court or the prosecutor to initiate a contempt proceeding under section 4548 of the Investigation Grand Jury Act, (the Act) 42 Pa.C.S.A. § 4548, (formerly 19 P.S. §§ 265–278 (Supp. 1980–81), Act of Nov. 22, 1978, P.L. 1148, No. 271).

Judge Savitt declined counsel's offer, stating "frankly, I'm not concerned with what the grand jury wants as far as this witness is concerned." The court then found Drapczuk in contempt of court and ordered him confined to the county jail until he purged himself of his contempt by agreeing to testify before the grand jury or until the grand jury expired (scheduled expiration date was May 30, 1981). The judgment of contempt was stayed by this Court pending determination of the instant petition.

Petitioner comes before this Court and asks us to find that the lower court erred in adjudicating him in contempt of court, and seeks reversal of the judgment of contempt. This petition raises the issue, whether under the Investigating Grand Jury Act, the record must disclose that the grand jury "obtain[ed] the initiation of contempt proceedings" before a witness may be adjudicated in contempt of court. I would answer this issue in the affirmative and would hold that the record fails to make the requisite disclosure. Accordingly, I would reverse the judgment of contempt.

The Act delineates the powers and structure of the grand jury, the roles to be played by the supervising judge and the attorneys for the Commonwealth and for the witness and the procedures to be followed in grand jury proceedings. 42 Pa.C.S.A. § 4548 sets out the powers of the investigating grand jury:

(a) The investigating grand jury shall have the power to inquire into offenses against the criminal laws of the Commonwealth. . . . Such power shall include the investigative resources of the grand jury which shall include but not be limited to the power of subpoena, the power to *obtain the initiation of civil and criminal contempt proceedings*, and every investigative power of any grand jury of the Commonwealth. . . . (emphasis added).

"Investigative resources of the grand jury" is defined as follows:

The power to compel the attendance of investigating witnesses; the power to compel the testimony of investigating witnesses under oath; *the power to take investigating testimony from witnesses who have been granted immunity*; the power to require the production of documents, records and other evidence; *the power to obtain the initiation of civil and criminal contempt proceedings* and every investigative power of any grand jury of the Commonwealth. 42 Pa.C.S.A. § 4542 Definitions (emphasis added).

The Act does not specify whether the supervising judge, acting either *sua sponte* or upon the motion of the attorney for the Commonwealth, may initiate contempt proceedings. I would conclude that no such action may be commenced absent a request by the investigating grand jury.

Initially, the only mention made in the Act of the contempt powers of the supervising judge is in a very narrow context. Section 4549, investigating grand jury proceedings, provides in subsection (c)(3) that a witness is permitted to have counsel present in the grand jury room during questioning, but does not permit counsel to address the jury or to make objections or arguments. The supervising judge has

the same power to remove such counsel as a judge has with respect to an attorney in any proceeding. The subsection then provides "[v]iolation of *this* subsection shall be punishable as contempt *by the supervising judge.*" (emphasis added). The Act seems to be designed, therefore, to grant the power to control recalcitrant witnesses to the grand jury, while *reserving* for the supervising judge the powers he has in all other proceedings to control the conduct of the attorneys by the contempt sanction.

This repose of contempt power over the witness in the grand jury is necessary to maintain in good working order a traditional and essential function of the grand jury—the protection of the individual against the sometimes awesome power of the investigating grand jury. The grand jury must perform the dual functions of "determining if there is probable cause to believe that a crime has been committed and of protecting citizens against unfounded criminal prosecutions." *Branzburg v. Hayes,* 408 U.S. 665, 687–88, 92 S.Ct. 2646, 2659–60, 33 L.Ed.2d 626 (1972). As was stated in *Wood v. Georgia,* 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569 (1962):

> Historically, this body has been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused, whether the latter be an individual, minority group, or other, to determine whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will.

The investigating grand jury can—and must—serve as a buffer between the government and the individual, and must attempt to balance the interests of society in effective investigative techniques against the interests and rights of the individual as guaranteed by the Constitutions of the United States and this Commonwealth.

The courts must preserve this balance, taking care to ensure that neither side be elevated to a position of importance above the other. When a witness is called before the

grand jury and compelled by a grant of immunity to give testimony against his desire to remain silent, the potential damage to the Fifth Amendment privilege must trigger close scrutiny of the proceedings. *See generally In re: County Investigating Grand Jury of June 1, 1979: Appeals of Bohannon and Wolf,* 495 Pa. 211, 433 A.2d 18 (1981) (Larsen, J., dissenting).

This Court has stated, in *Commonwealth v. Brady,* 470 Pa. 420, 424–25, 368 A.2d 699 (1977):

The Fifth Amendment thus defines the relationship between the government and the citizenry. It serves the function in our constitutional democracy of balancing the privacy and dignity of the individual with the power of the government to obtain testimony. While it may generally be asserted that the public "has the right to every man's evidence," that right is clearly limited by and subject to the Fifth Amendment. *Counselman v. Hitchcock,* 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892).

It has been recognized, however, that a grant of immunity may "supplant" the Fifth Amendment privilege, *provided that it is coextensive with that privilege.* This principle is premised upon the view that immunity leaves the witness and the government in substantially the same position as if the witness had claimed his privilege. *See, e. g., Kastigar v. United States,* 405 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1971); *Counselman v. Hitchcock, supra. While we recognize that immunity can be a valuable prosecutorial tool, we must also consider, however, that it constitutes an extraordinary exercise of power. It cannot be denied that a grant of immunity authorizes and even encourages interrogation which would otherwise be prohibited by the Fifth Amendment. Therefore, if a grant of immunity is to erase the line drawn by the privilege between government and citizen, it must be done so with the utmost care, and with the least possible infringement of Fifth Amendment rights.* (emphasis added).

This Court's concerns in *Brady* are amplified herein. The petitioner read statements to the grand jury indicating that

its powers had been abused—by the same attorneys for the Commonwealth who were still "guiding" the grand jury—by the misuse of supposedly immunized grand jury testimony of a previous witness/defendant.[1]  In light of these assertions, and given the "extraordinary exercise of power" in the use of immunity before an investigating grand jury as an investigative tool, it was incumbent upon the attorney for the Commonwealth and the supervising judge to allow the grand jury a meaningful opportunity to consider petitioner's statement and request, and to decide whether to proceed with the questioning of the witness.  Accordingly, I would hold that, before a supervising judge can find a witness in contempt of court for failure to testify before an investigating grand jury, it must appear on the record that the grand jury had requested the initiation of contempt proceedings.

As stated before, counsel had attempted, at the contempt proceeding, to discover the substance and outcome of the grand jury's deliberations after she and Drapczuk had left the grand jury room.  The supervising judge refused, however, to permit such inquiry as he was "frankly . . . not concerned with what the grand jury wants. . . ."  Since the record is devoid of *any* indication that the grand jury had requested the Commonwealth attorneys to obtain the initiation of contempt proceedings, it was improper to hold Drapczuk in contempt of court.

In part II of the majority opinion, the majority express their concern with a perceived conflict between the above interpretation of the Act and the "realties" of an investigating grand jury proceeding as reflected in the procedures adopted by this Court in *Robert Hawthorne, Inc. v. County Investigating Grand Jury*, 488 Pa. 373, 412 A.2d 556 (1980). The conflict vanishes upon consideration of the differences between a proceeding on a motion to quash a subpoena and a hearing on a charge of contempt.

1.  The factual allegations concerning the prior abuse in the Gary Zanecosky case are discussed fully in the dissenting opinion of this author in the companion cases of *In re: County Investigating Grand Jury of June 1, 1979: Appeals of Bohannon and Wolf,* respectively, 495 Pa. 211, 433 A.2d 18 (1981).

The contempt hearing was held to determine whether petitioner had refused to answer questions of the grand jury on the basis of the privilege against self-incrimination despite the grant of immunity. The statement which petitioner read to the grand jury (which the majority opinion does not even mention) requested the grand jury to refuse to *ask* any further questions because of prior abuse of its powers. Counsel for petitioner attempted to discover, at the contempt hearing, whether the grand jury had responded to petitioner's request favorably, but was met with the supervising judge's steadfast refusal to allow her to make a record on this point. Under my interpretation of the Act, the grand jury's refusal to *ask* further questions would render the ruling on the motion to quash moot, as there would have been, therefore, no refusal to *answer.*

As the majority notes, a preliminary hearing on the motion to quash the subpoena under *Hawthorne* is to determine whether the information sought from the witness is relevant to an investigation properly within the grand jury's jurisdiction and whether the information is not sought primarily for another purpose. *Id.,* 488 Pa. at 382–83, 412 A.2d at 560–61. These issues were not before the court at the contempt hearing (as discussed above). It is misleading, therefore, for the majority to assert that "petitioner impermissibly seeks to avoid review by this Court of the validity of the subpoena based on the standards adopted in *Hawthorne.*" The "standards adopted in *Hawthorne* " are simply not germaine to the determination of the validity of the judgment of contempt.

The majority attempts to buttress its argument by criticism of petitioner's so-called " 'presumption' that a grand jury does not intend its subpoenas to be enforced." This is a bogus argument as petitioner never offers such a presumption, either explicitly or implicitly. The petitioner asks, instead, that the grand jury which has issued a subpoena should be given an opportunity to change its mind when confronted with evidence of prosecutorial abuse of its powers. "Common sense" does not dictate that a grand jury will ·

be deaf and dumb to allegations of such abuse. The majority seems to believe the subpoena has been carved in stone, unalterable for all eternity.

The majority also utters the "presumption of regularity [which] attaches to the grand jury's proceedings" as the magic charm which will scare away the spectre of prior grand jury abuse. Since the majority chooses to ignore the salient facts regarding the *irregularity* of the grand jury proceedings because of prior grand jury abuse, it is predisposed to stand pat on asserted "presumptions." While invocation of such legal chants as "presumption of regularity" must be soothing to the majority, it has apparently dulled their senses to the fact of irregularity; in effect, the majority has fashioned an *irrebuttable* presumption of the regularity of grand jury proceedings despite evidence which shatters that presumption.

In part III, the majority takes a wholly unprecedented and dangerous tack. Part III is a disingenuous attempt by the majority to *sua sponte* create a new record. The majority states "petitioner Drapczuk's argument that the order adjudging him in contempt of court should be reversed because of an asserted void in the record regarding the desire of the grand jury to hear his testimony is defeated by the grand jury's own words." Incredibly, the majority fills the "void" in the record with the asserted "words" of the grand jury spoken *some two months after* the adjudication of contempt.

The "grand jury's own words" were apparently contained in a final report which, according to the majority, evince a desire "to hear [petitioner's] testimony" which desire the majority implicitly suggests is equivalent to a desire to obtain the initiation of contempt proceedings against petitioner. Presumably, this final report, which the majority characterizes as a "public record", was filed with the prothonotary of the Court of Common Pleas of Philadelphia County (see 42 Pa.C.S.A. § 4552(b). By no stretch of existing authority can resort to such matters which are *totally*

*dehors the record* be countenanced, especially where, as here, these matters have never been brought to the attention of the court by any of the parties to the litigation.[2]

There should be no need to remind the majority what constitutes the "record" before an appellate court. The Rules of Appellate Procedure, Pa.R.A.P. 1921, provide:

Composition of Record on Appeal

The original papers and exhibits filed in the lower court, the transcript of proceedings, if any, and a certified copy of the docket entries prepared by the clerk of the lower court *shall constitute the record on appeal in all cases.* (emphasis added).

Rule 1921 is in accord with the common law usage of the word "record" for appellate purposes,[3] and is intended as a codification of prior practice. *See* Note Pa.R.A.P. 1921. (The note states "An appellate court may consider only the facts which have been duly certified in the record on appeal. *Commonwealth v. Young,* 456 Pa. 102, 115, 317 A.2d 258, 264 (1974).")

Indeed, the prior practice was, and is, so firmly established that the principle—that an appellate court will consider only the official record of what has occurred in the proceedings before the lower tribunal and upon which that tribunal has premised its determination—has been referred to at various

---

**2.** No supplemental brief, memorandum or correspondence has been submitted by the parties which refers to the "final report" which the majority states was filed.

**3.** Black's Law Dictionary, 5th ed., defines "record on appeal" as: In the practice of appellate tribunals, the history of the proceedings on the trial of the action below (with the pleadings, offers, objections to evidence, rulings of the court, exceptions, charge, etc.), *in so far as the same appears in the record furnished to the appellate court in the paperbooks or other transcripts.* Hence, derivatively, it means the aggregate of the various judicial steps taken on the trial below, in so far as they were taken, presented, or allowed *in formal and proper manner necessary to put them upon the record of the court.* This is the meaning in such phrases as "no error in the record," "contents of the record," "outside the record," etc. (emphasis added)

times as "black letter"; [4] "axiomatic," [5] "fundamental", [6] and the "absolute rule." [7]

In *Commonwealth v. Young, supra,* the appellant had argued that the trial court's charge to the jury was inadequate. The judge asserted in his opinion that, although the charge on the official record was concededly inadequate, he had also read a more complete, sufficient charge from a xeroxed copy of an approved charge that he kept in his desk. Justice Roberts spoke for the majority of the Court; he stated:

> Appellate review has become such an integral part of our criminal procedure that it may properly be viewed as an extension of the trial itself. (citations omitted). The *fundamental tool for appellate review is the official record of what occurred at trial. Only the facts that appear in this record may be considered by a court.*[15]

---

[15] *The authorities are legion.* 456 Pa. at 115 and n.15, 317 A.2d at 264 and n.15. (emphasis added—citations omitted.)

In *In re Estate of England,* 414 Pa. 115, 200 A.2d 897 (1964), one of the parties attempted to "supplement" the record with certain documents after the appeal had been docketed. Speaking for a unanimous court, Justice Roberts, again, summarily dismissed this attempt, opining: "[i]t is sufficient to observe that the record sought to be suppressed [by appellee] consists entirely of matters not offered before the auditing judge or the court en banc and not made part of the audit proceedings from which this appeal is taken.

4. *Commonwealth v. Young,* 456 Pa. 102, 115 n.16, 317 A.2d 258, 264 n.16 (1974) (opinion of the Court by Justice Roberts).

5. *Wolf v. Commonwealth,* 403 Pa. 499, 504, 170 A.2d 557, 561 (1961) ("The Commonwealth's second argument is . . . somewhat amazing. It is axiomatic that on appeal only that which appears of record is subject to argument by counsel or to consideration by the appellate court.").

6. *Kilian v. Allegheny County Distributors,* 409 Pa. 344, 349, 185 A.2d 517, 519 (1962).

7. *Commonwealth v. Rini,* 285 Pa.Super. 475, 481, n.3, 427 A.2d 1385, 1389 n.3 (1981).

Therefore, the petition to suppress is granted." *Id.*, 414 Pa. at 122, 200 A.2d at 901.

*Kilian v. Allegheny County Distributors*, 409 Pa. 344, 185 A.2d 517 (1962) similarly involved attempts by one of the parties to supplement the record with a stipulation as to an amended complaint. The Court stated:

> This stipulation will not be considered. The scope of our review on the question under discussion is whether or not the lower court abused its discretion in denying the proposed amendment. *That issue must be resolved on the basis of the facts before the lower court and in the record upon the date the court rendered its decision. Clearly, under the facts then present, there was no abuse of discretion. To permit the proposed addition to the record at this late date would be grossly unfair and established a very dangerous precedent.* If counsel had filed the stipulation involved in the court below before decision, it would be a horse of another color. The delay was his, as is the responsibility for the resulting consequences. *It is fundamental that an appellate court will not consider on appeal a question not raised in the court below. . . . Nor are questions depending upon certain facts available on appeal, where such facts are not in the record. . . .*

*Id.*, 409 Pa. at 348–49, 185 A.2d at 518–19. (emphasis added—citations omitted).

In *Roth v. Columbia Distributing Co.*, 371 Pa. 297, 89 A.2d 825 (1952), the plaintiff below appealed the denial of an injunction. After the appeal had been docketed, plaintiff amended the complaint in equity and sought leave to amend the record on appeal in conformance with the amended complaint which had been filed in the prothonotary's office of the lower court. This Court said:

> "we do not think enlargement of the record in this court in order to include therein amendments made below subsequent to the taking of an appeal would be justified. . . . *orderly procedure requires that the action appealed from stand or fall on the record whereon the court below acted in entering the appealed order or decree.*" *Id.*, 271 Pa. at 305, 89 A.2d at 828–29 (emphasis added).

The principle embodied in these cases is, indeed, axiomatic. An appellate court is necessarily—and quite properly—confined to the official record which the parties have made before the lower court and which has been certified and transmitted to the reviewing court. On appeal, *it is obvious* that events that have occurred subsequent to the challenged determination in the lower court cannot be "on the record" nor could such events have *any* bearing on the validity of the lower court's ruling—that ruling must stand or fall on the record whereon the court below acted in entering the appealed order or decree. *Id.*

How far will the majority's innovation go? Where the parties in a property dispute fail to introduce a prior deed which they had believed to be irrelevant, can an appellate court which finds that deed relevant then go to the recorder of deeds in the appropriate county and obtain a copy? Where the parties in a civil litigation have failed to include documents demonstrating that certain required notice had been given, is the appellate court permitted to send its staff to the prothonotary and obtain the missing documents? The answers to these questions are obvious—these documents may be "public records" in that they have been filed and/or duly recorded in the proper government office. However, neither such documents, nor the final grand jury report in this case, automatically become part of the record on appeal simply because they are matters of "public record."

This Court cannot—on its own or by motion of a party—permit enlargement of the record by incorporation of subsequent events. Such a practice would produce an administrative nightmare as the record on review would remain open indefinitely, presumably at least until the appellate court rendered its decision. (Perhaps beyond since the parties might petition for reargument on the basis of subsequent events. One must wonder whether the majority's peculiar view of what constitutes a "record" would permit such a practice). The rules of appellate procedure and the overwhelming weight of authority (according to Justice Roberts, the "authorities are legion" in support of the proposition

that an appellate court cannot consider anything which is not part of the record. *Commonwealth v. Young, supra,* 456 Pa. at 115 and n.15, 317 A.2d at 264 and n.15.) precludes such openendedness of a record on appeal. How then, can the majority ignore the "black letter" law and stretch out its own resources to create a new record? Is there some perceived distinction between the authority discussed above and the instant proceedings. I think not—the majority would be hard-pressed to advance a distinction with a straight face and any such attempt would be intellectually dishonest.

In the case of *Commonwealth v. Robinson,* 474 Pa. 313, 378 A.2d 809 (1977), a majority of this Court affirmed per curiam a conviction for criminal contempt. The exact reasons for the contempt did not appear on the transcript of the case, (the stenographer had merely noted "disturbances" at trial) although the trial judge specifically enumerated the instances of contemptuous conduct in its opinion filed eight months later. Despite the fact that the *opinion* was before this Court and described sufficient evidence to uphold the contempt conviction, Justice Roberts wrote a vigorous dissent (joined by Justice Manderino) wherein he took the majority to task for apparently relying on evidence not on the official record.

Justice Roberts stated:

This Court has held *without exception* that only facts appearing in the record may be relied upon to support a criminal conviction. (citations omitted). Recently, this Court, reiterated that "we *will not consider* any question which depends upon facts not contained in the record." (citations omitted).

Accordingly, we have refused to accept assertions of fact contained in opinions of the trial curt where the record was deficient as to these facts. (citations omitted) In [*Commonwealth v. Africa,* 466 Pa. 603, 353 A.2d 855 (1976) (plurality opinion)]. . . [a]lthough we had "no doubt that the court has accurately recited what transpired," *id.,*

*supra,* 466 Pa. at 625, 353 A.2d at 866, we nonetheless discharged the convictions [for contempt] because they were not founded on evidence in the record.

Here, the trial court announced in open court that it was holding appellant in contempt for defying court orders and challenging the integrity of the court. The court could have dictated to the court reporter a description of the contumacious conduct, as the trial court did in *Commonwealth v. Patterson,* 452 Pa. 457, 308 A.2d 90 (1973).* However, it failed to do so. Thus, there is no evidence of record of the disturbances noted by the court reporter which would support appellant's conviction for contempt.

---

\* The only proper means for correcting or amending the record was through compliance with statutory procedures. (citations omitted). Having failed either to place the relevant facts on record in open court or to amend the record according to the required procedures, the court itself is responsible for the gap in the record.

> "When a matter is brought to this Court on appeal it necessarily comes before us on a printed record and the litigants are entitled to have their rights adjudicated on the basis of what the record shows and not upon what the court below may intimate or suggest is not shown. If the record in this case is in any way deficient, it is the fault of the trial judge for not having had it truly and fully reflect all material and important trials matters." (emphasis in original).

*Commonwealth v. Lofton,* 389 Pa. 273, 282, 133 A.2d 203, 207 (1957). *Id.,* 474 Pa. at 317–18, 378 A.2d at 811–12. (emphasis added).

It seems that the concern of Justice Roberts for the absence of evidence on the record to support a judgment of contempt has evaporated into thin air. The final report of the grand jury in the instant case, asserted by the majority to have been filed pursuant to 42 Pa.C.S.A. § 4552, is even further off the record than the trial judge's recitation in his opinion in *Robinson* of the contumacious behavior supporting

that judgment of contempt. Counsel for petitioner attempted to make a record concerning the grand jury's intent but the supervising judge explicitly stated he was not concerned with the desire of the grand jury and, thus, ensured that no indication of the jury's intent would appear *on the record.*

At the contempt hearing, counsel moved to dismiss the contempt charge on the "ground that the Commonwealth has failed to meet the burden of showing that they are authorized to ask you to hold him in contempt; that they have the authority to make that request." Notes of Testimony, March 30, 1981, 27. The failure of the Commonwealth to make a showing on the record that would sustain their burden of proof cannot be rectified retroactively either at the request of a party or by the *sua sponte* action of the Court.

Perhaps the most distressing aspect of the majority opinion, in addition to an unwarranted redefinition of "record" and an abolition of Pa.R.A.P. 1921, is the majority's willingness to become an active *participant* in this litigation. To venture off the record *on its own initiative* in an attempt to plug a gap in the record caused by the failure of the parties to supply relevant information to the court below or, as here, by a legal ruling of the court preventing such information to come to light, is appalling, especially where the information sought to be subsequently engrafted onto the official record would remain outside the record even if it had been submitted by way of supplemental briefs of a party. Such affirmative manipulation of the proceedings is profoundly disturbing and shocking—it distorts the role of an appellate court as a neutral and unbiased arbiter which is to *review* the merits of the case *in light of* the evidence and information which the adversaries have brought before it, *not to formulate the evidence* in the first instance.

When members of this Court, or their staff, engage in the process of ferreting out information which they deem relevant, not only is the neutral position of the Court destroyed,

but the party which is prejudiced by such information is denied due process. Petitioner has had no opportunity to respond to the "final report" of the grand jury. Petitioner might be able to discover errors in the transcript, or point to other portions of the report to refute the inferences which the majority has gleaned from it. (It should be noted that, as the report is not now, and never has been, a part of the record before us, we have only the majority's conclusions as to the inferences raised by that report.) Reasonable men can and do differ on the inferences raised from statements and facts and, for this reason alone, the opportunity to examine the whole report and argue its inferences to this Court must exist. The actions of the majority have denied petitioner that opportunity.

While I do not doubt that a final report of the grand jury has been filed with the prothonotary of the Court of Common Pleas of Philadelphia pursuant to 42 Pa.C.S.A., § 4552, it is not the responsibility, function or privilege of this Court to seek out and utilize such information on its own initiative, without the benefit of the arguments and participation of the parties.[8]

8. The majority does not attempt to justify its bizarre technique by labelling its conduct "judicial notice", as, indeed, it could not legitimately. (The majority uses the nebulous phrase "public record" for whatever *that* is worth). Judicial notice has been described as:
   The act by which a court, in conducting a trial, or framing its decision, will, of its own motion, and without the production of evidence, recognize the existence and truth of certain facts, having a bearing on the controversy at bar, which, from their nature, are not properly the subject of testimony, or which are universally regarded as established by common notoriety, e. g., the laws of the state, international law, historical events, the constitution and course of nature, main geographical features, etc. The cognizance of certain facts which judges and jurors may properly take and act upon without proof, because they already know them.
   Black's Law Dictionary, 5th Ed. There is no precedent for treating a document such as a grand jury report as a matter fit for judicial notice. The doctrine of judicial notice cannot be invoked to cover evidentiary gaps of a party who had failed to meet a burden of proof. *Graham v. Triangle Publications, Inc.*, 233 F.Supp. 825 (E.D.Pa.1964), aff'd 344 F.2d 775 (3d Cir. 1965). *See also Stone v. New Schiller Bldg., Loan Ass'n.*, 293 Pa. 161, 142 A.2d 293 (1928).