433 A.2d 18

In re COUNTY INVESTIGATING GRAND JURY OF JUNE 1, 1979.

Appeal of David BOHANNON.

Appeal of Richard WOLF.

Supreme Court of Pennsylvania.

Argued April 21, 1981.

Decided July 31, 1981.

Marvin Comisky, Jerome R. Richter, Norman E. Greenspan, C. Oliver Burt, III, Philadelphia, for petitioner.

Steven H. Goldblatt, Jane Greenspan, Philadelphia, for respondent.

Before ROBERTS, NIX, LARSEN, FLAHERTY and WILKINSON, JJ.

## OPINION

PER CURIAM:

Orders affirmed. *See also In Re Investigating Grand Jury of Philadelphia County: Appeal of Richard Drapczuk,* 495 Pa. 186, 433 A.2d 5 (1981).

O'BRIEN, C. J., and Mr. Justice KAUFFMAN, J., did not participate in the consideration or decision of these cases.

LARSEN, J., filed a dissenting opinion.

LARSEN, Justice, dissenting.

I dissent to the per curiam affirmance of the lower court's orders. On June 22, 1979, the Honorable David N. Savitt,

Court of Common Pleas of Philadelphia County, accepted for submission to the June 1, 1979 Investigating Grand Jury of Philadelphia County an investigation into alleged tampering with water pollution monitoring and sampling equipment at Mrs. Paul's Kitchens, Inc. (Mrs. Paul's). After 15 months of investigation, the grand jury issued a presentment against David Bohannon and Richard Wolf (*inter alia*), petitioners herein, and Richard Drapczuk, petitioner in No. 162 E.D. Misc.Dkt. 1981, recommending that each be charged with theft of services (18 Pa.C.S.A. § 3926), unsworn falsification (18 Pa.C.S.A. § 4904), obstructing the administration of law (18 Pa.C.S.A. § 5101), conspiracy (18 Pa.C.S.A. § 903), and corrupt organizations (18 Pa.C.S.A. § 911). Following five days of preliminary hearing, petitioners were held over for court on these charges on March 9, 1981.

Petitioners Bohannon and Wolf were subpoenaed on March 31, 1981 to appear before the grand jury. On April 14, these petitioners filed motions to quash the subpoenas which were denied by Judge Savitt, who also on that date granted the Commonwealth's petition for an immunity order over petitioners' objections.

The petitioners then went before the grand jury and each in turn read prepared statements explaining that they would decline to answer any further questions. Their reasons as embodied in the statements for their refusals were essentially, that the immunity orders of Judge Savitt were, under the facts of these cases insufficient to safeguard their Fifth Amendment privileges against self-incrimination because of prior abuse by the same prosecutors of grand jury testimony in a criminal trial also stemming from the Mrs. Paul's investigation (in the case of one Gary Zanecosky). The statements explained to the grand jury its obligation to protect the individuals who come before it from such asserted abuse, and requested the grand jury to refuse to ask further questions *and* to refuse to obtain the initiation of contempt proceedings against petitioners.

The grand jury discussed the statements and expressed a desire, nevertheless, to ask certain further questions of the

petitioners. Upon refusing to answer the questions, each petitioner was informed, in the presence of the grand jury, that he would be taken before Judge Savitt for an adjudication of possible contempt. The grand jury session was recessed, the contempt proceeding was held immediately, and Judge Savitt found petitioners to be in contempt of court and ordered them confined to the county jail until they purged themselves of contempt by agreeing to testify before the grand jury or until the grand jury expired (scheduled expiration date was May 30, 1981). This Court stayed the judgments of contempt against these petitioners pending determination of their petitions for relief.

Petitioners come before this Court and ask us to find that the lower court erred in denying the motions to quash the subpoenas, in issuing the immunity orders, and in adjudicating them in contempt of court, and seek appropriate relief for these asserted errors. The petitions raise this issue: whether the immunity granted in this proceeding pursuant to section 5947 of the Judicial Code, 42 Pa.C.S.A. § 5947 is coextensive with the Fifth Amendment privilege against self-incrimination.[1] Because I believe that, under the facts of this case, the immunity granted petitioners was not coextensive with the Fifth Amendment privilege, I would reverse the orders of the lower court and grant the relief requested.

"The constitutional inquiry, rooted in logic and history, as well as in the decisions of this Court, is whether the immunity granted under [the federal witness immunity]

1. The petitions also argue that the Investigating Grand Jury Act, Act of November 22, 1978, P.L. 1148, No. 271, formerly 19 P.S. §§ 265–278, recodified at 42 Pa.C.S.A. §§ 4541–4563.1 requires that, before a witness may be adjudicated in contempt of court, the record must disclose that the investigating grand jury obtained the initiation of contempt proceedings. For the reasons stated in the dissenting opinion of this author to the companion case of *In re: County Investigating Grand Jury of June 1, 1979: Appeal of Drapczuk*, 495 Pa. 186, 433 A.2d 5 (1981), I agree that the Act imposes such a requirement. However unlike in *Drapczuk*, I believe the requirement was fully met in the instant proceedings as the record clearly and unambiguously discloses that the grand jury did obtain the initiation of contempt proceedings.

statute is coextensive with the scope of the privilege. If so, petitioners' refusals to answer based on the privilege were unjustified, and the judgments of contempt were proper, for the grant of immunity has removed the dangers against which the privilege protects. (citation omitted) If, on the other hand, the immunity granted is not as comprehensive as the protection afforded by the privilege, petitioners were justified in refusing to answer, and the judgments of contempt must be vacated. (citation omitted)."

*Kastigar v. United States*, 406 U.S. 441, 449, 92 S.Ct. 1653, 1659, 32 L.Ed.2d 212 (1972).

The Fifth Amendment to the United States Constitution provides in relevant part that "no person . . . shall be compelled in any criminal case to be a witness against himself." In 1892, the United States Supreme Court first considered a challenge to the constitutionality of an immunity statute and concluded "no statute which leaves the party or witness subject to prosecution after he answers the criminating question put to him, can have the effect of supplanting the privilege conferred by the Constitution of the United States. . . . In view of the constitutional provision, a statutory enactment, to be valid, must afford absolute immunity against future prosecution for the offense to which the question relates." *Counselman v. Hitchcock*, 142 U.S. 547, 585–86, 12 S.Ct. 195, 206, 35 L.Ed. 1110 (1892). This decision was, understandably, subsequently read to prohibit immunity as a means of compelling testimony unless it was complete transactional immunity, i. e. immunity from prosecution for any offense touching upon the subject matter of the immunized testimony.

Through the years the broad language of *Counselman* was explained and narrowed with references to its "conceptual basis", *see, e. g., Ullmann v. United States*, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956) and *Arndstein v. McCarthy*, 254 U.S. 71, 41 S.Ct. 26, 65 L.Ed. 138 (1920), until in *Kastigar, supra*, the United States Supreme Court dispelled the notion that only transactional immunity would suffice. The Court held that the federal immunity

statute's explicit proscription of the use in any criminal case of "testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information)" is consonant with Fifth Amendment standards. We hold that such immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege. While a grant of immunity must afford protection commensurate with that afforded by the privilege, it need not be broader. Transactional immunity, which accords full immunity from prosecution for the offense to which the compelled testimony relates, affords the witness considerably broader protection than does the Fifth Amendment privilege. The privilege has never been construed to mean that one who invokes it cannot subsequently be prosecuted. Its sole concern is to afford protection against being "forced to give testimony leading to the infliction of 'penalties affixed to . . . criminal acts.'" Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom, affords this protection. It prohibits the prosecutorial authorities from using the compelled testimony in *any* respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness.

406 U.S. at 453, 92 S.Ct. at 1661. A companion case, *Zicarelli v. New Jersey State Commission of Investigation*, 406 U.S. 472, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972) applied the ruling of *Kastigar* to the states.

A necessary component of the *Kastigar* standard is the heavy burden of proof that, once a defendant demonstrates that he has testified under a grant of immunity, the prosecution must overcome the taint that such testimony was used against him by establishing that they had an independent source for all of the disputed evidence. *Id.* 406 U.S. at 460, 92 S.Ct. at 1664–65 quoting *Murphy v. Waterfront Commission of New York Harbor*, 378 U.S. 52, 79 n.18, 84 S.Ct. 1594, 1609 n.18, 12 L.Ed.2d 678 (1964). This burden of proof "is

not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Id.* As was stated by the Court of Appeals for the Second Circuit "[t]he Government's burden is a 'heavy one' (citation omitted) and properly so lest it become the 'loose net to trap tainted evidence' of which Mr. Justice Marshall warned in dissenting [in *Kastigar*] as to the constitutionality of use immunity." *United States v. Nemes*, 555 F.2d 51, 55 (2d Cir. 1977) (citation omitted).

The Pennsylvania statute is of the use/derivative use variety. 42 Pa.C.S.A. § 5947(d) provides:

Limitation on use.—No testimony or other information compelled under an immunity order, or any information directly or indirectly derived from such testimony or other information, may be used against a witness in any criminal case, except that such information may be used:
(1) in a prosecution [relating to perjury or false swearing];
(2) in a contempt proceeding for failure to comply with an immunity order; or
(3) as evidence, where otherwise admissible, in any proceeding where the witness is not a criminal defendant.

It must be determined whether the immunity granted by 42 Pa.C.S.A. § 5947(d) is coextensive with the Fifth Amendment privilege under the circumstances of *this* case. I would hold that it is not.

*Kastigar* emphasized that *any* use of immunized testimony is improper because the witness must remain in substantially the same position as if he had claimed his privilege in the absence of a grant of immunity. 406 U.S. at 457. Subsequent federal and state cases have elaborated on the meaning of "any use" as including the many subtle and all but impossible to detect uses to which immunized grand jury testimony might be put. "Such use could conceivably include assistance in focusing the investigation, deciding to initiate prosecution, refusing to plea-bargain, interpreting

evidence, planning cross-examination, and otherwise generally planning trial strategy." *United States v. McDaniel*, 482 F.2d 305, 311 (8th Cir. 1973).

The inherent difficulty with such subtle uses is that the proof of non-use lies uniquely within the subjective realm of the prosecutors' knowledge. Justice Brennan stated the problem succinctly:

> In dealing with a single jurisdiction, we ought to recognize the enormous difficulty in attempting to ascertain whether a subsequent prosecution of an individual, who has previously been compelled to incriminate himself in regard to the offense in question, derives from the compelled testimony or from an 'independent source'. For one thing, all the relevant evidence will obviously be in the hands of the government—the government whose investigation included compelling the individual involved to incriminate himself. Moreover, this argument does not depend upon assumptions of misconduct or collusion among government officers. It assumes only the normal margin of human fallibility. Men working in the same office or department exchange information without recording carefully how they obtained certain information; it is often impossible to remember in retrospect how or when or from whom information was obtained. By hypothesis, the situation involves one jurisdiction with presumably adequate exchange of information among its various law enforcement officers. Moreover, the possibility of subtle inferences drawn from action or non-action on the part of fellow law enforcement personnel would be difficult if not impossible to prove or disprove."

*Piccirillo v. New York*, 400 U.S. 548, 568, 91 S.Ct. 520, 530–31, 27 L.Ed.2d 596 (1971) (Brennan, J., dissenting). *See also* Note, Standards for Exclusion in Immunity Cases after Kastigar and Zicarelli, 82 Yale L.J. 171 (1972) and the Supreme Court, 1971 Term, 86 Harv.L.Rev. 1, 181 (1972).

These considerations have persuaded one state court, the Supreme Court of Hawaii, to reject a state use/derivative use statute as being inadequate to protect a defendant's

privilege against self-incrimination under the state constitution. *Hawaii v. Miyasaki*, 614 P.2d 915 (Hawaii 1980). That court held "[s]ince a conferral of use and derivative use immunity pursuant to [state statute] does not maintain a person in substantially the same position he was before being compelled to produce incriminating evidence, we conclude there was no valid basis for charging a violation of the [state statute creating the crime of obstruction of justice for failure to testify over a grant of immunity]." *Id.* at 926.

Other courts have applied *Kastigar* to particular factual matrices and have found the protection afforded by use/derivative use statutes wanting in the given situation. The general principle is that "[t]he constitutional validity of use [and derivative use] immunity as distinguished from transactional immunity depends upon *fair adherence to the integrity of the process*." *United States v. Moss*, 562 F.2d 155, 164 (2d Cir. 1977). (emphasis added).

In *United States v. McDaniel*, 482 F.2d 305 (8th Cir. 1973), the defendant had been convicted of embezzlement and misappropriation of funds by a federal district court despite a state grant of transactional immunity conferred upon him because he had testified before a state grand jury. The eighth circuit had remanded the case for an evidentiary hearing to determine if the defendant had testified before the state grand jury under a grant of immunity and, if so, whether the federal prosecution was predicated upon the same subject matter as defendant had testified to before the state grand jury. Under pre-*Kastigar* procedure, this was the test in the multiple jurisdiction situation to determine whether a defendant was immune from federal prosecution.

After the circuit court has remanded, *Kastigar* was decided. Under *Kastigar*, a federal prosecution had only to honor a grant of immunity from another jurisdiction as fully as the Constitution required—that is, the federal prosecution could try the defendant for crimes related to the subject matter of immunized testimony but could not use testimony from the state grand jury in any way. The federal district court, deciding the remand under *pre-Kastigar* standards, held that

the state grant of immunity insulated defendant from the federal prosecution, and dismissed the indictments.

The government appealed that decision, asserting that *Kastigar* applied, and offered proof which, they claimed, could demonstrate they had met the *Kastigar* "heavy burden." The circuit court agreed that *Kastigar* applied but held "[u]nder these circumstances, we are of the opinion that the government is confronted with an *insurmountable task* in discharging the heavy burden of proof imposed by *Kastigar." Id.* at 311.

The critical factor in *McDaniel* was that the federal prosecutor had seen the transcript of the state grand jury proceeding. Even though the government offered extensive documentation and reports to show that all evidence used at trial had been gathered prior to the reading of that transcript by the prosecutor, the court ruled "such reports nevertheless fail to satisfy the government's burden of proving that the United States Attorney, who admittedly read McDaniel's testimony prior to the indictments, did not use it in some significant way short of introducing tainted evidence." *Id.* The court focused on the many subtle and virtually undetectable uses to which the immunized testimony could be put, and found that the "immeasurable subjective effect" of the prosecutors reading of the immunized testimony rendered it *impossible* for the government to meet its burden of proof. It further stated:

In so concluding, we cast no reflection upon the integrity or motives of the United States Attorney. To the contrary, he has demonstrated by his appearances in our court and the records of the trials in the district court that he is a prosecutor who adheres to the high professional standards of the legal profession and to the duties and responsibilities of a United States Attorney. But even so, the United States Attorney is subject to human frailties. Thus, although he asserts that he did not use McDaniel's testimony in any form, we cannot escape the conclusion that the testimony could not be wholly obliterated from the prosecutor's mind in his preparation and trial of the case. *Id.* at 312.

Finally, the court felt that a remand for yet another evidentiary hearing on the issue of the prosecutor's use (or nonuse) of the immunized testimony would be a "futile gesture." *Id.*

In a strikingly similar case wherein a federal prosecutor had seen immunized grand jury testimony, the federal district court for the Southern District of New York was perplexed by the problem "[h]ow do you make sure that a person who has testified under a grant of immunity will be protected against subsequent criminal charges to the same extent as if he had originally pleaded the Fifth Amendment? . . . It is difficult for the court to speculate as to the effect that the reading of the minutes might have had on the conduct and thinking processes of the Assistant charged with the prosecution of the case." *United States v. Dornau,* 359 F.Supp. 684, 687 (S.D.N.Y.1973), rev'd. on other grounds 491 F.2d 473 (2d Cir. 1974). District Judge Metzner concluded:

> It appears to me that once the subject matter was touched upon in the privileged testimony, and the prosecutor had read it, he could have used it in a variety of ways in this criminal prosecution. *The possibility of such use, and the impossibility of clearly showing that the use did not occur* calls for the holding in this case that the defendants were denied the constitutional protection that their silence would have given them. *Murphy v. Waterfront Commission,* 378 U.S. 52, 79, 84 S.Ct. 1594 [1609], 12 L.Ed.2d 678 (1964). The breadth of this ruling is justified by the language in *Kastigar* that the immunized testimony could not be used *"in any respect."*

*Id.* at 687 (emphasis added). *See also United States v. Hinton,* 543 F.2d 1002 (2d Cir. 1976), *cert. denied,* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976) *and* 97 S.Ct. 796 (1977); *but cf. Goldberg v. United States,* 472 F.2d 513 (2d Cir. 1973) (rejecting a *per se* rule that would have held use/derivative use immunity inadequate under Fifth Amendment where grand jury witness was also a defendant

awaiting trial). While I do not agree with the Supreme Court of Hawaii that use/derivative use immunity can *never* provide adequate protection for Fifth Amendments rights, I find the reasoning of the *McDaniel* and *Dornau* courts persuasive.

In the instant case, the witnesses are already defendants in a criminal case on the eve of their trials.[2] The testimony sought by the prosecutors—information regarding petitioners' superiors—can be elicited following petitioners' trials (even if the term of the present grand jury has expired, it would be a simple matter to petition for an extension or to convene another grand jury following the trials). But by far the most significant factor in my determination is the history of prior abuse of *this grand jury* by *the same prosecutors* conducting the grand jury investigation of these petitioners. The facts of that abuse are as follows:

On April 6, 1981, Judge Lynne M. Abraham, Court of Common Pleas of Philadelphia County, granted a new trial to one Gary Zanecosky who had been convicted of the same charges stemming from the investigation of Mrs. Paul's. Zanecosky had given immunized testimony before the grand jury approximately one month before his trial was scheduled to commence. At that time, Mr. Zanecosky gave testimony about a particular conversation he had had with a Frederico Cabato. Mr. Cabato had given grand jury testimony before, but had never mentioned this conversation. The assistant district attorneys who received the immunized testimony were the same assistant district attorneys who eventually tried Zanecosky. (And are the same prosecutors "guiding" the grand jury investigation of petitioners.)

The prosecutors used Zanecosky's grand jury testimony to prepare Cabato's testimony at trial. Consequently, Judge Abraham held "the Commonwealth has made an egregious

2. Companion case petitioner Drapczuk's trial was scheduled to begin on June 8, 1981; the record is unclear as to petitioners Bohannon and Wolf but the Commonwealth makes no objection to their characterization of the grand jury session as "on the eve of trial."

error in preparing its case for trial by use of grand jury notes, specifically in preparing a witness by the name of Cabato, for his trial testimony." Notes of Testimony, *Commonwealth v. Zanecosky*, April 6, 1981 at 3. Judge Abraham continued that she did not believe the prosecutors acted in "bad faith or with malice" but had just made a terrible error that "is especially problematical in view of Judge Savitt's pretrial motion warning, in effect, the Commonwealth to be very careful about the use of grand jury testimony . . . I think they just lost sight of some problems, and that's primarily my reason for the grant of a new trial." *Id.* at 5.

This "egregious error" was compounded by conduct of the prosecutors before the grand jury. At the grand jury session on April 14th, Bohannon was questioned first, then Wolf. After Wolf had read his statement and he and his counsel had left the grand jury room, the grand jury discussed the questions they wanted to ask of Wolf in the presence of the prosecutors. One grand juror then asked the assistant district attorneys to leave the room. The grand jury conferred privately for five minutes. When the Commonwealth's attorneys returned, the following colloquy took place:

Let the record reflect it is approximately 3:21 p. m. and the District Attorneys Rosenberg and Sikorski have reentered the room along with the reporter.

THE FOREMAN: It is the will of the majority of the Grand Jury that he answer the questions put to him.

A GRAND JUROR: Zanecosky was on trial. Was that evidence used against him that was taken in this room? We would like to know that.

MR. ROSENBERG: You have heard a lot about what happened and what has not happened in front of Judge Abraham. Judge Abraham has not written an opinion. She has to. When she writes the opinion I will read it to you and let you know what Judge Abraham found. *To go through claims and counterclaims, what they say occurred*

*and what we contend occurred, I don't think would serve any useful purpose because it would get us off into a side issue that's not necessarily before us.* What I would do is read to you what it is the Judge found. She has not written her opinion though. Gary Zanecosky was granted a new trial.

Mr. Cotter, is it the will of the Grand Jury that Mr. Bohannon also be heard?

THE FOREMAN: The majority want him to testify.

MR. ROSENBERG: Bohannon and Wolf?

THE FOREMAN: Yes. Speaking of Bohannon now, we have already said that to Wolf.

Mr. Rosenberg's statement was extremely misleading. It failed to acknowledge the prior misuse of immunized grand jury testimony *despite* Judge Abraham's clear and explicit oral statements in front of assistant district attorney John Sikorski who was conducting petitioners' grand jury investigation along with Mr. Rosenberg.

In light of the foregoing, the taint raised by the conduct of the prosecutors renders it *impossible* for the Commonwealth to discharge its heavy burden of proving that *no* use will be made of the immunized testimony. The grant of immunity has failed once in this investigation to measure up to the exacting standards of *Kastigar.* Because of this failure and the subsequent actions of the assistant district attorneys, this Court should not permit the procedure to be utilized again with the concommitant risk that the witnesses' testimony will be used against them in perhaps undetectable ways. We must be vigilant in enforcing the *Kastigar* burden of proof to prevent the watering-down of the protections guaranteed by the Fifth Amendment.

The Commonwealth has purported to have "sealed the evidence" it intends to use at trial,[3] but the sealing of

3. I approve of such practice which, in another situation, might permit the Commonwealth to sustain its burden.

evidence sheds no light on the many subtle uses to which the immunized testimony can be put. The Commonwealth has also offered that the trial prosecutor will be someone totally unconnected with and unfamiliar with the grand jury investigations. This offer is also insufficient, under the facts of this case, to safeguard petitioners' Fifth Amendment privileges—the prosecutor's office is an entity, *Commonwealth v. Hallowell*, 477 Pa. 232, 383 A.2d 909 (1978), and, human nature being what it is and communication among prosecutors being as efficient as is expected and normal, *Piccirillo v. New York, supra* 400 U.S. at 568, 91 S.Ct. at 530–31 (Brennan, J., dissenting) and *Hawaii v. Miyasaki, supra* 614 P.2d at 636, the assurances of the District Attorney's office are unable to overcome the taint of abuse that its prior conduct has placed upon this investigation. Accordingly, I would find that the heavy burden placed upon the Commonwealth to establish that *no use* would be made of immunized testimony is virtually undischargeable under the circumstances presented.[4]

For the foregoing reasons stated above, I would reverse the judgments of contempt against each petitioner, vacate the orders granting immunity to each petitioner, and reverse the orders denying the motions to quash the subpoenas.

**4.** I would not adopt a *per se* rule for investigations wherein the witness before the grand jury is also a defendant awaiting trial. Circumstances might exist where the prosecution could meet its *Kastigar* burden. *See, e. g., United States v. Pantone*, 634 F.2d 716 (3rd Cir. 1980) (defendant convicted in first trial and appealed; court of appeals reversed and remanded; prior to remanded second trial, defendant gave testimony before a grand jury under a grant of immunity; defendant raised pre-trial motion to dismiss indictment arguing, *inter alia*, government will be unable to discharge *Kastigar* burden; third circuit disagrees and distinguishes *McDaniel* on grounds that, because of transcript of Pantone's first trial and prosecutor's assurance that the reprosecution would exactly parallel the first, court determined that objective evidence would be sufficient to demonstrate whether or not government had made any use of immunized testimony).