STATE of Alaska, Petitioner,

v.

The Honorable Rene GONZALEZ, Jeffrey S. DeGrasse, Carl Jahnke–Leland, and Jill Jahnke–Leland, Respondents.

No. A–4063.

Court of Appeals of Alaska.

Feb. 14, 1992.

---

3. I agree with the majority's resolution of the remaining issues in this case.

Eric A. Johnson, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for petitioner.

Margi Mock, Ray Brown, Asst. Public Defenders, and John B. Salemi, Public Defender, Anchorage, for respondent Jeffrey S. DeGrasse.

Michael A. Thompson, Juneau, for respondent Carl Jahnke–Leland.

Jeffrey F. Sauer, Juneau, for respondent Jill Jahnke–Leland.

Before BRYNER, C.J., COATS, J., and ANDREWS, Superior Court Judge.*

## OPINION

BRYNER, Chief Judge.

In this case, we review a superior court order deciding that Alaska's witness immunity statute violates the Alaska Constitution's privilege against self-incrimination. We affirm the superior court's order.

## PROCEDURAL BACKGROUND

Jill Jahnke–Leland, Carl Jahnke–Leland, Peter H. Leland, and Jeffrey DeGrasse were jointly charged with first-degree murder, attempted first-degree murder, and related offenses stemming from a shooting incident near Ketchikan. The superior court ordered separate trials for the defendants. Jill Jahnke–Leland was tried first. The jury acquitted her of murder and attempted murder, but convicted on the lesser-included offenses of manslaughter and assault.

Peter Leland and Jeffrey DeGrasse elected to proceed jointly and were tried next. Their jury acquitted them of first-degree murder and attempted murder but deadlocked as to lesser-included offenses and the remaining charges. The superior court declared a mistrial and scheduled a retrial on the unresolved charges.

Prior to the retrial, the state issued a subpoena for Jill Jahnke–Leland to appear as a prosecution witness against Leland and DeGrasse. The state sought to compel Jahnke–Leland's testimony by offering her immunity in compliance with Alaska's witness immunity statute, AS 12.50.101(a), which assures that "no testimony or other information compelled under ... [an] order [of immunity], or information directly or

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

indirectly derived from that testimony or other information, may be used against the witness in a criminal case...."

Jahnke–Leland moved to quash the subpoena. Asserting her constitutional privilege against compulsory self-incrimination, Jahnke–Leland claimed that the statutory prohibition against use of her testimony or information derived therefrom—"use and derivative use immunity"—was constitutionally deficient and that she could adequately be protected against self-incrimination only by a broader grant of immunity categorically precluding her from being prosecuted for any transaction as to which she was compelled to testify—"transactional immunity."

Superior Court Judge Rene J. Gonzalez granted Jahnke–Leland's motion to quash the subpoena. Judge Gonzalez found the witness immunity statute's provision for use and derivative use immunity to be insufficient and concluded that "only transactional immunity is adequate to protect an individual's right against self-incrimination under Article I, § 9 of the Alaska Constitution."

The state then applied to this court for review of Judge Gonzalez's order.[1] Because the case presents an important legal issue of first impression, the immediate resolution of which would further public interest, we granted the state's application and directed briefing on the merits.[2]

## FEDERAL LAW

The issue presented in this case is whether the Alaska Constitution will permit the state to compel potentially self-incriminatory testimony from a witness by an offer of use and derivative use immunity, or, conversely, whether a broader form of immunity—transactional immunity—is required.[3] Although this issue is one of state constitutional law, decisions construing the federal constitution's privilege against self-incrimination provide the backdrop against which the state constitutional issue must be decided.

The fifth amendment to the United States Constitution guarantees that "[n]o person ... shall be compelled in any criminal case to be a witness against himself...." The importance of this constitutional privilege would be difficult to exaggerate: "[T]he American system of criminal prosecution is accusatorial, not inquisitional, and ... the Fifth Amendment privilege is its essential mainstay." *Malloy v. Hogan*, 378 U.S. 1, 7, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964). In *Ullmann v. United States*, 350 U.S. 422, 426–27, 76 S.Ct. 497, 500–01, 100 L.Ed. 511 (1956), the Court described the privilege as "an important advance in the development of our liberty—'one of the great landmarks in man's struggle to make himself civilized.'"

Viewed literally, the language of the privilege would appear only to preclude compelling the accused in a criminal case to testify. However, it is now well settled that the privilege:

can be asserted in any proceeding, civil or criminal, administrative or judicial, in-

---

1. *See* Alaska Appellate Rule 404(a); *Surina v. Buckalew*, 629 P.2d 969, 972–73 (Alaska 1981).

2. *See* Alaska Appellate Rule 402(b)(2).

3. In the present case, Jill Jahnke–Leland has been convicted of and sentenced for manslaughter in connection with the incident as to which her testimony is sought; her conviction awaits appellate review. A grant of use and derivative use immunity under these circumstances would have no effect on Jahnke–Leland's pending appeal and would not preclude the state from reprosecuting in the event of a reversal. On retrial, use and derivative use immunity would only prohibit the state from any direct or indirect reliance on Jahnke–Leland's immunized testimony or the fruits thereof. The potential effects of a grant of transactional immunity, on the other hand, are not clear-cut. While this is an issue that the parties have not briefed and that we do not decide in this opinion, we note that cases from other jurisdictions suggest that transactional immunity would have no effect on Jahnke–Leland's pending appeal and would require dismissal of charges only in the event of a reversal on appeal. *See, e.g., Katz v. United States*, 389 U.S. 347, 349 n. 3, 88 S.Ct. 507, 510 n. 3, 19 L.Ed.2d 576 (1967); *Reina v. United States*, 364 U.S. 507, 512–14, 81 S.Ct. 260, 263–65, 5 L.Ed.2d 249 (1960); *State v. Runions*, 100 Wash.2d 52, 665 P.2d 1358 (1983); *cf. Steinberger v. District Court*, 596 P.2d 755 (Colo. 1979); *State v. McCullough*, 49 Wash.App. 546, 744 P.2d 641 (1987).

vestigatory or adjudicatory; and it protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used.

*Kastigar v. United States*, 406 U.S. 441, 444–45, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972) (footnotes omitted). Likewise, it is settled that the privilege extends to a party or a witness alike. *Malloy v. Hogan*, 378 U.S. at 11, 84 S.Ct. at 1495.

■ Although the privilege against self-incrimination stands as an absolute bar against compelled testimony, it does not attach in all situations. By its own terms, it cannot be claimed when a witness has no reasonable grounds to fear that an answer might be incriminatory. *See Hoffman v. United States*, 341 U.S. 479, 486–87, 71 S.Ct. 814, 818–19, 95 L.Ed. 1118 (1951); *see also McConkey v. State*, 504 P.2d 823, 826 (Alaska 1972). This principle has led to the view that a witness may be compelled to testify in exchange for immunity from future prosecution.

The first immunity case to reach the Supreme Court was *Counselman v. Hitchcock*, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892). In *Counselman*, the Court considered the validity of a federal immunity statute authorizing the testimony of a witness to be compelled, provided that no "evidence obtained from a party or witness by means of a judicial proceeding ... shall be given in evidence, or in any manner used against him ... in any court of the United States." *Id.* at 560, 12 S.Ct. at 197.

The Court found the challenged statute deficient because it protected the witness only from direct use of compelled testimony, and not from use of the fruits thereof. *Id.* at 586, 12 S.Ct. at 206.

The Court condemned the statute in broad terms:

> We are clearly of opinion that no statute which leaves the party or witness subject to prosecution after he answers the criminating question put to him, can have the effect of supplanting the privilege conferred by the Constitution of the United States.... In view of the consti-

tutional provision, a statutory enactment, to be valid, must afford absolute immunity against future prosecution for the offense to which the question relates.

*Id.* at 585–86, 12 S.Ct. at 206.

Soon after *Counselman* was decided, Congress enacted an immunity statute authorizing the testimony of witnesses to be compelled upon a grant of transactional immunity. In *Brown v. Walker*, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896), the Supreme Court reviewed the transactional immunity statute.

The issue in *Brown* was whether any form of immunity could displace the constitutional guarantee against compelling a witness to provide incriminatory testimony. The Court observed that its earlier ruling in *Counselman v. Hitchcock* raised the inference that, if a "statute does afford ... [absolute] immunity against future prosecution, the witness will be compellable to testify." *Brown v. Walker*, 161 U.S. at 594, 16 S.Ct. at 645. The Court found this inference supported by prior cases addressing the privilege against self-incrimination, which in its view established that "if the testimony sought cannot possibly be used as a basis for, or in aid of, a criminal prosecution against the witness, the rule [against compulsory self-incrimination] ceases to apply, its object being to protect the witness himself and no one else...." *Id.* at 597, 16 S.Ct. at 647. Finding that the transactional immunity statute amounted to a virtual grant of amnesty from future prosecution, the Court concluded:

> While the constitutional provision in question is justly regarded as one of the most valuable prerogatives of the citizen, its object is fully accomplished by the statutory immunity, and we are, therefore, of opinion that the witness was compellable to answer....

*Id.* at 610, 16 S.Ct. at 652.

Notably, four justices in *Brown v. Walker* dissented from the majority opinion, maintaining that, under the fifth amendment, even a broad grant of transactional immunity did not justify the government in compelling potentially self-incriminatory testimony from a reluctant witness. *Id.* at

610–28, 16 S.Ct. at 651–52 (Shiras, J., dissenting), 628–38, 16 S.Ct. at 652–56 (Field, J., dissenting).

Sixty years later, in *Ullmann v. United States,* 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956), the United States Supreme Court was asked to reconsider the decision in *Brown v. Walker* and to adopt the views of the dissenting justices. At issue in *Ullmann* was the federal Immunity Act of 1954, which provided for transactional immunity in much the same language as the 1893 act challenged in *Brown v. Walker. See Ullmann,* 350 U.S. at 423–24, 76 S.Ct. at 498–99. In refusing to alter its prior holding, the *Ullmann* Court, in an opinion authored by Justice Frankfurter, emphasized that

> the Court's holding in *Brown v. Walker* has never been challenged; the case and the doctrine it announced have consistently and without question been treated as definitive by this Court.... The 1893 statute has become part of our constitutional fabric and has been included "in substantially the same terms, in virtually all of the major regulatory enactments of the federal government."

*Ullmann,* 350 U.S. at 437–38, 76 S.Ct. at 506–07 (citations omitted).

Reaffirming *Brown v. Walker,* the Court in *Ullmann* reiterated the view that transactional immunity afforded protections equivalent to those of the fifth amendment:

> The privilege against self-incrimination is a specific provision of which it is peculiarly true that "a page of history is worth a volume of logic." For the history of the privilege establishes not only that it is not to be interpreted literally, but also that its sole concern is, as its name indicates, with the danger to a witness forced to give testimony leading to the infliction of "penalties affixed to the criminal acts...." ... Immunity displaces the danger. Once the reason for the privilege ceases, the privilege ceases.

*Ullmann,* 350 U.S. at 438–39, 76 S.Ct. at 506–07 (citations and footnote omitted).

By emphasizing that the doctrine of *Brown v. Walker* had "consistently and without question been treated as definitive" and by characterizing the federal immunity act, with its provision for transactional immunity, as "part of our constitutional fabric," 350 U.S. at 437–38, 76 S.Ct. at 506–07, *Ullmann* reinforced the widespread belief—originally fostered by the Court's strong language in *Counselman v. Hitchcock*—that only transactional immunity would meet the requirement of offering protections equivalent to those assured by the fifth amendment.

Not until eight years after *Ullmann* did the Supreme Court plant the first seeds of doubt as to whether transactional immunity was constitutionally compelled. In *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), the Court extended the fifth amendment's privilege against self-incrimination to the states via the due process clause of the fourteenth amendment. This ruling necessitated a reevaluation of earlier decisions holding that, to be effective, a grant of immunity needed only to protect a witness against prosecution in the jurisdiction where the testimony was sought. *See, e.g., Feldman v. United States,* 322 U.S. 487, 64 S.Ct. 1082, 88 L.Ed. 1408 (1944); *United States v. Murdock,* 284 U.S. 141, 52 S.Ct. 63, 76 L.Ed. 210 (1931).

In *Murphy v. Waterfront Commission of New York Harbor,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964)—a companion case to *Malloy v. Hogan*—the Court took up this issue. After a thorough review of its past decisions and relevant decisions of the English courts, the Court concluded

> that there is no continuing legal vitality to, or historical justification for, the rule that one jurisdiction within our federal structure may compel a witness to give testimony which could be used to convict him of the crime in another jurisdiction.

*Murphy,* 378 U.S. at 77, 84 S.Ct. at 1608. The Court thus held

> that the constitutional privilege against self-incrimination protects a state witness against incrimination under federal as well as state law and a federal witness

against incrimination under state as well as federal law.

*Id.* at 77–78, 84 S.Ct. at 1608–09.

This left the Court with a dilemma: since under the supremacy clause of the United States Constitution states had no authority to preclude federal prosecution by a promise of immunity, it was unclear whether state prosecutors would ever be capable of making a grant of immunity "so broad as to have the same extent in scope and effect" as the fifth amendment. *Counselman*, 142 U.S. at 585, 12 S.Ct. at 206.

The *Murphy* Court resolved this dilemma by adopting an exclusionary rule for federal cases involving defendants who had been granted immunity under state law:

> [W]e hold the constitutional rule to be that a state witness may not be compelled to give testimony which may be incriminating under federal law unless the compelled testimony and its fruits cannot be used in any manner by federal officials in connection with a criminal prosecution against him. We conclude, moreover, that in order to implement this constitutional rule and accommodate the interests of the State and Federal Governments in investigating and prosecuting crime, *the Federal Government must be prohibited from making any such use of compelled testimony and its fruits. This exclusionary rule*, while permitting the states to secure information necessary for effective law enforcement, *leaves the witness and the Federal Government in substantially the same position as if the witness had claimed his privilege* in the absence of a state grant of immunity.

*Murphy*, 378 U.S. at 79, 84 S.Ct. at 1609 (footnote omitted) (emphasis added).

In a concurring opinion, Justice White seized on the Court's adoption of use and derivative use immunity for dual jurisdiction cases as an opportunity to advance the idea that transactional immunity would not be constitutionally required even in single jurisdiction cases. *Id.* at 92–107, 84 S.Ct. at 1610–18. In the years following *Murphy v. Waterfront*, Justice White's concept of use and derivative use immunity gained increasing notice.

In *Piccirillo v. New York*, 400 U.S. 548, 91 S.Ct. 520, 27 L.Ed.2d 596 (1971), the Supreme Court granted *certiorari* to consider the validity of a New York statute that appeared to provide only for use and derivative use immunity. While the case awaited Supreme Court consideration, however, the New York Court of Appeals, in a separate case, construed the statute to require transactional immunity. On this basis, the Supreme Court dismissed the writ of *certiorari* as improvidently granted. The decision by the majority of the court to dismiss in *Piccirillo*, however, prompted Justice Brennan to write a dissenting opinion in which he argued that transactional immunity was constitutionally compelled and that use and derivative use immunity could not afford protections that were coextensive with those set out in the fifth amendment. *Id.* at 561–73, 91 S.Ct. at 527–33.

The same year the Court granted *certiorari* in *Piccirillo*, Congress enacted a revised immunity statute providing for use and derivative use immunity, rather than transactional immunity. In *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), the Supreme Court upheld the statute, adopting the views expressed by Justice White in his separate concurrence in *Murphy*. The majority of the Court in *Kastigar* dismissed as *dicta* language from *Counselman v. Hitchcock* and subsequent cases suggesting that transactional immunity was the only form of immunity offering protections coextensive with those set out in the fifth amendment. *Kastigar*, 406 U.S. at 454–55, 92 S.Ct. at 1661–62. *Kastigar* identified the true basis for *Counselman's* holding to be merely that a statute protecting only against direct use of compelled testimony, without also prohibiting use of information derived from that testimony, was inadequate. *Id.*

The Court went on to note that use and derivative use immunity had been described in *Murphy v. Waterfront Commission* as substantially equivalent to the fifth amend-

ment privilege. The Court found no basis for declining to extend *Murphy*'s holding to the single jurisdiction context:

> The *Murphy* Court was concerned solely with the danger of incrimination under federal law, and held that immunity from use and derivative use was sufficient to displace the danger. This protection coextensive with the privilege is the degree of protection that the Constitution requires, and is all that the Constitution requires even against the jurisdiction compelling testimony by granting immunity.

*Kastigar,* 406 U.S. at 458–59, 92 S.Ct. at 1663–64.

The Court then went on to consider the practical problem of how a court might decide whether a prosecution was based, directly or indirectly, on previously compelled testimony. Again, the Court relied on *Murphy,* which placed on the government the burden of proving that its evidence was not tainted and had an independent, legitimate source. *Kastigar* emphasized that:

> [T]his burden of proof, which we reaffirm as appropriate, is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.

*Kastigar,* 406 U.S. at 460–61, 92 S.Ct. at 1664–65.

The majority opinion in *Kastigar* engendered two vigorous dissents, one from Justice Douglas and one from Justice Marshall; both drew heavily on the dissent written in *Piccirillo v. New York* by Justice Brennan, who did not participate in *Kastigar.* Justice Douglas decried the *Kastigar* majority's apparent view that *Murphy v. Waterfront Commission* overruled *Counselman v. Hitchcock sub silentio. Kastigar,* 406 U.S. at 463, 92 S.Ct. at 1666. He concluded:

> When we allow the prosecution to offer only "use" immunity we allow it to grant far less than it has taken away. For while the precise testimony that is

compelled may not be used, leads from that testimony may be pursued and used to convict the witness. My view is that the framers put it beyond the power of Congress to *compel* anyone to confess his crimes. The self-incrimination clause creates, as I have said before, "the federally protected right of silence," making it unconstitutional to use a law to "pry open one's lips and make him a witness against himself." That is indeed one of the chief procedural guarantees in our accusatorial system. Government acts in an ignoble way when it stoops to the end which we authorize today.

*Kastigar,* 406 U.S. at 466–67, 92 S.Ct. at 1667–68 (footnote and citation omitted).

In his separate dissent, Justice Marshall expressed even greater skepticism as to whether use and derivative use immunity could actually be coextensive with the fifth amendment or with transactional immunity:

> I do not see how it can suffice merely to put the burden of proof on the government. First, contrary to the Court's assertion, the Court's rule does leave the witness "dependent for the preservation of his rights upon the integrity and good faith of the prosecuting authorities." For the information relevant to the question of taint is uniquely within the knowledge of the prosecuting authorities. They alone are in a position to trace the chains of information and investigation that lead to the evidence to be used in a criminal prosecution. A witness who suspects that his compelled testimony was used to develop a lead will be hard pressed indeed to ferret out the evidence necessary to prove it. And of course it is no answer to say that he need not prove it, for though the Court puts the burden of proof on the government, the government will have no difficulty in meeting its burden by mere assertion if the witness produces no contrary evidence. The good faith of the prosecuting authorities is thus the sole safeguard of the witness' rights. Second, even their good faith is not a sufficient safeguard. For the paths of information through the investi-

gative bureaucracy may well be long and winding, and even a prosecutor acting in the best of faith cannot be certain that somewhere in the depths of his investigative apparatus, often including hundreds of employees, there was not some prohibitive use of the compelled testimony. The Court today sets out a loose net to trap tainted evidence and prevent its use against the witness, but it accepts an intolerably great risk that tainted evidence will in fact slip through that net.

*Kastigar,* 406 U.S. at 469, 92 S.Ct. at 1669 (citations omitted).

■ *Kastigar*'s declaration that the fifth amendment demands no more than a grant of use and derivative use immunity to supplant the privilege against self-incrimination remains unaltered to this day. In the present case, Jill Jahnke–Leland has no valid claim of privilege under the United States Constitution. *Kastigar* establishes that the state's offer of use and derivative use immunity is the effective equivalent of Jahnke–Leland's fifth amendment privilege.

### ALASKA LAW

Recognizing that no valid claim would exist under the fifth amendment, however, Jahnke–Leland has asserted her privilege under article I, § 9 of the Alaska Constitution. We must turn, accordingly, to the Alaska Constitution. Article I, § 9 commands that "[n]o person shall be compelled in any criminal proceeding to be a witness against himself." The Alaska Supreme Court has never expressly determined whether this provision can be displaced by use and derivative use immunity, or whether transactional immunity is instead required. On two occasions, the court has

been presented with the issue but has declined to decide it.

In *Surina v. Buckalew,* 629 P.2d 969 (Alaska 1981), the court determined that the prosecution had inherent authority to confer immunity on a reluctant witness, even in the absence of statutory authorization. *Id.* at 979. The court expressed the general view that Rule 732 of the Uniform Rules of Criminal Procedure "provides appropriate guidance concerning the exercise of" the state's authority to grant immunity. While Uniform Rule 732(b) calls for transactional rather than use and derivative use immunity, the supreme court stopped short of endorsing that standard. *Id.* at 979 n. 21. Instead, noting that the parties had raised no issue as to the scope of immunity that would suffice, the court indicated that it would "leave for another day the question of what the Alaska Constitution requires in this respect." *Id.* at 980.

In *State v. Serdahely,* 635 P.2d 1182 (Alaska 1981), the Alaska Supreme Court was again asked to determine the scope of immunity that would be necessary to compel a reluctant witness to testify. Instead of deciding the issue on constitutional grounds, however, the court invoked its supervisory powers and opted, summarily, for transactional immunity:

> This court adopts pursuant to its supervisory powers as a rule of practice the provisions of Rule 732 of the Uniform Rules of Criminal Procedure including subsection (b) relating to the nature and scope of immunity for the reasons expressed in the commentary to the rule.

*Id.* at 1182.

In response to the Alaska Supreme Court's apparent deference to the legislature,[4] the Alaska legislature, in 1982,

---

**4.** The court's deference to the legislature on what scope of immunity should be required is evidenced by its reluctance to express any overt preference in *Surina,* 629 P.2d at 979 n. 21, and its subsequent reliance on its supervisory powers in *State v. Serdahely.* Equally telling is the court's observation, in *Surina,* "that there is merit to the position that the decision here should be a legislative one.... [W]e emphasize the 'crying need' for appropriate legislation." *Surina,* 629 P.2d at 978.

In this connection, we note that Jahnke–Leland challenges Alaska's witness immunity statute as invalidly enacted. Jahnke–Leland characterizes *State v. Serdahely*'s adoption of Uniform Criminal Rule 732 as an exercise of the court's formal rule-making authority. Alaska Const. art. IV, § 15. Under article IV, § 15, once the supreme court promulgates a rule, that rule may be changed by the legislature only "by two-thirds vote of the members elected to each house." Furthermore, unless the legislature's

adopted Alaska's witness immunity statute, AS 12.50.101, specifying use and derivative use as the applicable standard of immunity in Alaska. In contrast to the Alaska Supreme Court's preference for the policies favoring transactional immunity, as expressed in the commentary to Uniform Criminal Rule 732(b), the legislature indicated its preference for policies favoring use and derivative use immunity and stated its belief that such immunity would pass muster under the Alaska Constitution. *See* House Journal Supplement No. 63 at 12–16, 1982 House Journal 2356.

Given the supreme court's reluctance in *Surina* and *Serdahely* to decide the scope of immunity required by the Alaska Constitution, the validity of Alaska's witness immunity statute remains an open question. To answer this question, we must decide whether article I, § 9 of the Alaska Constitution embodies more stringent protections than are available under the fifth amendment to the United States Constitution.

While the United States Constitution imposes the minimal constitutional standards that we must enforce,

> we are free, and we are under a duty, to develop additional constitutional rights and privileges under our Alaska Constitution if we find such fundamental rights and privileges to be within the intention and spirit of our local constitutional language and to be necessary for the kind of civilized life and ordered liberty which is at the core of our constitutional heritage.

*Baker v. Fairbanks,* 471 P.2d 386, 401–02 (Alaska 1970). It is the responsibility of Alaska courts to "depart whenever necessary from constitutional interpretations enunciated by the United States Supreme Court and to develop rights and privileges under the Alaska constitution in accordance with our own unique legal background." *Scott v. State,* 519 P.2d 774, 783 (Alaska 1974).

■ The starting point for interpreting any constitutional provision is the original understanding of those who drafted it. "[T]he fundamental principle in construing a constitutional provision is to give effect to the intention of the framers and the people adopting it." *HGEA v. County of Maui,* 59 Haw. 65, 576 P.2d 1029, 1039 (1978).

The Alaska Constitution's guarantee that "[n]o person shall be compelled in any criminal proceeding to be a witness against himself" is virtually identical to the corresponding guarantee in the fifth amendment to the United States Constitution. *Biele v. State,* 371 P.2d 811, 813 n. 6 (Alaska 1962). From this similarity in language, a fair inference arises that the drafters of the Alaska Constitution intended article I, § 9 to guarantee protections commensurate with those then available under the fifth amendment. Our inquiry must thus focus on the manner in which the fifth amendment was interpreted and understood when the Alaska Constitution was enacted:

> This is but another application of the familiar rule that where one State adopts the laws of another, it is also presumed to adopt the known and settled construction of those laws by the courts of the state from which they are taken.

intent to modify a supreme court rule is expressed in the text of the bill purporting to enact the modification, no modification will occur. *See Leege v. Martin,* 379 P.2d 447 (Alaska 1963). According to Jahnke–Leland, because the legislature failed to specifically state, in the language of AS 12.50.101, its intent to modify *Surina v. Buckalew,* the statute does not work a modification of the decision.

We reject this argument, for we believe it mistaken in characterizing *Surina v. Buckalew* as an exercise of formal rule-making power under article IV, § 15. In our view, the strong preference that the supreme court expressed in *Surina* for initial legislative action, the court's evidently calculated reference in *Serdahely* to its "supervisory powers" as opposed to its constitutional "rule-making power," *see* Alaska Const. art. IV, § 15, and the court's subsequent failure to formally promulgate the substance of Uniform Criminal Rule 732 as an Alaska Rule of Criminal Procedure, all strongly indicate that the supreme court intended *State v. Serdahely* to control practice and procedure in the courts only provisionally, until the legislature took action. We do not construe *State v. Serdahely* as having been intended to place the legislature under the restrictions mandated by article IV, § 15.

*Brown v. Walker,* 161 U.S. at 600, 16 S.Ct. at 648.

Alaska's constitutional convention adopted the Alaska Constitution on February 5, 1956; the people of Alaska ratified it on April 24, 1956. The drafting and ratification of Alaska's privilege was thus roughly contemporaneous with the United States Supreme Court's opinion in *Ullmann v. United States,* in which Justice Frankfurter characterized the federal transactional immunity statute as having become "part of our constitutional fabric." *Ullmann,* 350 U.S. at 438, 76 S.Ct. at 506. The universally accepted view at that time was that, in keeping with *Counselman v. Hitchcock* and *Brown v. Walker,* only transactional immunity could be deemed coextensive with the protections of the fifth amendment.[5] As we have previously pointed out, the first serious doubts concerning the constitutional status of transactional immunity did not arise until the Supreme Court's 1964 decision in *Murphy v. Waterfront Commission*—fully eight years after the Alaska Constitution was enacted, and more than five years after the constitution formally took effect with the proclamation of statehood on January 3, 1959.

The universal acceptance of transactional immunity in 1956 is convincing evidence that, by selecting language for Alaska's privilege against self-incrimination that was identical to the language of the federal constitutional privilege, the drafters of our constitution contemplated that article I, § 9

would also be read to require transactional immunity.

Under circumstances almost identical to those in Alaska, the Supreme Court of Hawaii concluded that the drafters of its constitution intended to require transactional immunity when they wrote the Hawaii Constitution. *See State v. Miyasaki,* 62 Haw. 269, 614 P.2d 915 (1980). The Hawaii Constitution was drafted in 1950, several years before Alaska's constitution was written. The Alaska and Hawaii constitutions took effect contemporaneously, with the proclamation of statehood in 1959. Article I, § 10 of the Hawaii Constitution—like article I, § 9 of the Alaska Constitution—embodies the privilege against self-incrimination in language virtually identical to that of the fifth amendment. *See Miyasaki,* 62 Haw. 269, 614 P.2d at 917 n. 5. In determining the intent of the drafters of article I, § 10, the Hawaii Supreme Court stated:

> That *transactional* immunity had been "part of our constitutional fabric" from 1893 could not have been lost to a convention that included lawyers among its members. Nor can we conclude the sanguine statements about the Fifth Amendment and interpretations strongly favoring the privilege may have escaped the members of a constitutional convention convened in 1950. *Transactional* immunity is undoubtedly part of the "fabric" of Article I, § 10 notwithstanding the tear in the "fabric" of the federal constitution caused by *Kastigar....*

*Miyasaki,* 614 P.2d at 922–23 (footnotes omitted).

---

**5.** As Justice Brennan put it in his dissenting opinion in *Piccirillo v. New York,* 400 U.S. at 571–72, 91 S.Ct. at 532–33 (citations and footnotes omitted):

> By 1956, Mr. Justice Frankfurter, writing for the Court, could assert that the 1893 statute, enacted shortly after *Counselman* and adopting the transactional immunity standard, had "become part of our constitutional fabric." *Ullmann v. United States,* 350 U.S. 422, 438, 76 S.Ct. 497, 506, 100 L.Ed. 511. Again, the Court in *Ullmann* relied on the transactional immunity standard to reaffirm the holding of *Brown v. Walker* against the dissent of two Justices who repeated the arguments of the *Brown* dissenters that even transactional immunity did not satisfy the constitutional privilege.

> *Ullmann's* assertion that transactional immunity has "become part of our constitutional fabric" finds support in the action of Congress in the 78 years since *Counselman* first announced the standard. Congress has written more than 40 immunity provisions into various federal statutes during that time, and with one minor and unexplained exception in 1898 and two exceptions in 1970, every provision has provided for transactional immunity. Moreover, as reflected by an appendix in petitioner's brief, the majority of state immunity statutes provide for transactional immunity, even though the States were not subject to the full effect of the Fifth Amendment until 1964.

Just as Hawaii's Supreme Court found it unlikely that the members of its constitutional convention were unaware of federal law, so we find it inconceivable that members of Alaska's constitutional convention could have ignored the fact that transactional immunity was perceived as "part of our constitutional fabric." [6]

Of course, our constitution is not static. We are not inflexibly tied to the interpretation of the fifth amendment that the drafters of article I, § 9 intended to adopt:

> We are not bound in expounding the Alaska Constitution's Declaration of Rights by the decisions of the United States Supreme Court, past or future, which expound identical or closely similar provisions of the United States Constitution.

*Roberts v. State*, 458 P.2d 340, 342 (Alaska 1969). *See also Baker v. Fairbanks*, 471 P.2d at 401–02.

Yet this does not mean that we should depart from the understanding and intent of the drafters of the Alaska Constitution whenever the United States Supreme Court changes its course on corresponding provisions of the federal constitution. To the contrary, while the Alaska Supreme Court has noted its freedom and duty "to develop additional constitutional rights and privileges under our Alaska Constitution," *Baker v. Fairbanks*, 471 P.2d at 402, it has exercised this freedom and duty only upon finding "such fundamental rights and privileges to be within the intention and spirit of our local constitutional language and to be necessary for the kind of civilized life and ordered liberty which is at the core of our constitutional heritage." *Id.* (footnote omitted).

Our supreme court has also eschewed reflexive adherence to changes at the federal constitutional level:

> We are not bound to follow blindly a federal constitutional construction of a fundamental principle if we are con-

---

**6.** The state attempts to distinguish *Miyasaki* by pointing out that the Hawaii Supreme Court relied in part on a report of its constitutional convention expressly stating that art. I, § 10, was "derived from the first three clauses of the 5th Amendment ... and will give to this State the benefit of Federal decisions construing the same." *Miyasaki*, 614 P.2d at 922. The state points out that the proceedings of the Alaska constitutional convention contain no corresponding statement of intent with regard to article I, § 9. However, as reflected in the rule that a state is "presumed to adopt the known and settled construction of ... laws by the courts of the state from which they are taken," *Brown v. Walker*, 161 U.S. at 600, 16 S.Ct. at 648, the statement of intent relied on by the Hawaii Supreme Court only makes explicit that which is unmistakably implicit. Absent some affirmative declaration of intent to depart from the meaning of the federal constitutional language, there is simply no basis for presuming that the members of the Alaska constitutional convention intended article I, § 9 to extend protections substantively different from those then available under the federal constitution.

Indeed, although the proceedings of the Alaska constitutional convention contain no helpful discussion on article I, § 9, the convention debate concerning Alaska's due process clause, article I, § 7, is enlightening. Article I, § 7 of the Alaska Constitution provides:

> No person shall be deprived of life, liberty, or property without due process of law. The right of all persons to fair and just treatment

in the course of legislative and executive investigations shall not be infringed.

The second clause of this provision, dealing with fair and just treatment in the course of investigations, is unique to Alaska. Convention debate surrounding this provision makes it clear that its drafters were particularly concerned about the abuses and inquisitorial practices that had occurred in the McCarthy investigations. The debate on the fair and just treatment clause makes clear that the members of Alaska's constitutional convention were acutely aware of the limits of the federal constitution in protecting individuals against such abuse. If anything, the constitutional debate and the ultimate inclusion of the provision in article I, § 7 bear witness to the convention's concern that protections against compulsory self-incrimination under the federal constitution might be inadequate. For example, *Ullmann v. United States* reaffirmed, in the context of a McCarthy era grand jury investigation, that the fifth amendment does not protect witnesses against general public opprobrium or similar collateral consequences stemming from being forced to testify under immunity. 350 U.S. at 430–31, 76 S.Ct. at 502–03. The debate on article I, § 7 establishes that this provision was included in the Alaska Constitution for the specific purpose of preventing government officials from using their investigative powers in order to inflict such harm on witnesses. *See* 2 Proceedings of the Alaska Constitutional Convention (PACC) 1446–1469 (January 7, 1956).

vinced that the result is based on unsound reason or logic.

*Scott v. State*, 519 P.2d at 783. Blind adherence to federal constitutional change is especially inappropriate "where 'unexpected' decisions from the [United States Supreme] Court 'have forced a serious re-evaluation of ... fundamentals.'" *State v. Miyasaki*, 614 P.2d at 922 (quoting *State v. Kaluna*, 55 Haw. 361, 520 P.2d 51, 57 (1974)).

After carefully considering the United States Supreme Court's decision in *Kastigar*, the Hawaii Supreme Court has declined to depart from the original intent of the drafters of its privilege against self-incrimination. Similarly, the Supreme Court of Massachusetts has refused to accept *Kastigar*'s shift in direction as an adequate basis for revising its views of the Massachusetts constitution's privilege against self-incrimination:

> To assume that, because of the common source of the principle articulated in each Constitution, the two provisions must have the same meaning would overturn the interpretation of the Massachusetts Constitution given with clarity and careful consideration in *Emery's Case*, 107 Mass. 172 (1871).... Positive safeguards secured to individuals by the Massachusetts Constitution, yet not available under the cognate provisions of the United States Constitution, should not be thus circumscribed.

*Attorney General v. Colleton*, 387 Mass. 790, 444 N.E.2d 915, 921 (1982).

■ The United States Supreme Court's decisions interpreting the fifth amendment do not decide the meaning of the Alaska privilege, and similarity in language does not make the United States Supreme Court the primary interpreter of article I, § 9. *See State v. Soriano*, 68 Or.App. 642, 684 P.2d 1220, 1222 (in banc), *summarily aff'd*, 298 Or. 392, 693 P.2d 26 (1984). Departure from the original intent of the drafters of article I, § 9 requires something more than a recent shift in federal constitutional interpretation.

■ Yet the state has failed to provide any compelling, or even cogent, reason for altering the original meaning of article I, § 9. The state argues only that, as a matter of social policy, use and derivative use immunity is preferable to transactional immunity, since it better accommodates the state's undeniably legitimate interest in investigating and prosecuting criminal activity. According to the state, scrupulous application of use and derivative use immunity can protect the rights of witnesses as effectively as both transactional immunity and the constitutional privilege itself.

The state's position is essentially an argument based on expediency. That the legislature may deem one course desirable because it accommodates the state's interest by facilitating prosecution does not justify departing from a different course taken by our constitution to protect the rights of Alaska citizens.[7] As the Alaska Supreme Court has said:

> The argument from expediency contains inherent defects. If an individual

---

7. The competing social policies favoring use and derivative use immunity, on the one hand, and transactional immunity, on the other, are summarized and discussed in 2 W. LaFave and J. Israel, *Criminal Procedure*, § 8.11(b) (1984), and in the Uniform Rules of Criminal Procedure, (U.L.A.) rule 732(b), commentary at 342–53 (1974). Also, compare Feldman and Ollanik, *Compelling Testimony In Alaska: The Coming Rejection Of Use And Derivative Use Immunity*, 3 Alaska L.Rev. 229, 250–54 (1986) with Note, *Standards for Exclusion in Immunity Cases after Kastigar and Zicarelli*, 82 Yale L.J. 171 (1972). In *State v. Serdahely*, the Alaska Supreme Court expressed its preference for the policies favoring transactional immunity, as delineated in the commentary to Uniform Criminal Rule 732(b). Alaska's legislature, in contrast, expressed its

preference for the policies favoring use and derivative use immunity, and explained its views in considerable detail when it enacted the 1982 witness immunity statute. *See* House Journal Supp. No. 63 at 12–16, 1982 House Journal 2356. For purposes of this opinion, it is unnecessary for us to select between the countervailing policies. Nor should our opinion be taken as indicating that the Alaska Supreme Court's preference for the policies favoring transactional immunity should prevail over the legislature's preference for the policies favoring use and derivative use immunity. Our point, rather, is that restriction of a constitutionally specified right necessarily requires more than legislative preference for social policies differing from those expressed in a specific constitutional provision.

right is vested by the Constitution, the overriding demands of governmental efficiency must be of a compelling nature and must be identifiable as flowing from some enumerated constitutional power. To allow expediency to be the basic principle would place the individual constitutional right in a secondary position, to be effectuated only if it accorded with expediency.

This would negate our entire theory of constitutional government. The American Constitutional theory is that constitutions are a restraining force against the abuse of governmental power, not that individual rights are a matter of governmental sufferance.

*Baker v. Fairbanks,* 471 P.2d at 394 (footnote omitted).

The state's position in this case is flawed in other significant respects. Any narrowing of the originally intended meaning of Alaska's privilege against self-incrimination would seem incompatible with prior decisions in which the Alaska Supreme Court and this court have interpreted article I, § 9 to provide for broader protections than are available under the fifth amendment. In *Scott v. State,* 519 P.2d at 783–85, the Alaska Supreme Court interpreted article I, § 9 to invalidate a trial court order that required the defendant to disclose, in advance of trial, details concerning potential alibi witnesses. This interpretation was at odds with *Williams v. Florida,* 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), in which the United States Supreme Court held that such disclosure was not problematic under the fifth amendment.

It is particularly noteworthy that the Supreme Court's decision in *Scott* was motivated in large part by the Court's fear that compelled disclosure of details concerning an alibi defense might be used indirectly by the prosecution to the disadvantage of the accused. *Scott,* 519 P.2d at 785. The fear of this type of nontestimonial use of compelled testimony by the prosecution is precisely what has generated the severest and most enduring criticism of use and derivative use immunity. *Cf. McCracken v. Co-*

*rey,* 612 P.2d 990, 999–1001 (Alaska 1980) (Rabinowitz, J., concurring).

In *Pinkerton v. State,* 784 P.2d 671 (Alaska App.1989), this court construed article I, § 9 of the Alaska Constitution to require that limited target warnings be given to potential defendants subpoenaed by the state to testify before the grand jury. A similar requirement had been rejected as a matter of federal constitutional law in *United States v. Washington,* 431 U.S. 181, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977).

Beyond these cases construing Alaska's privilege against self-incrimination more stringently than its federal counterpart, several other decisions dealing with related rights under the Alaska Constitution counsel strongly against a hasty narrowing of article I, § 9. In *Breese v. Smith,* 501 P.2d 159 (Alaska 1972), the supreme court interpreted article I, § 1 of the Alaska Constitution, which includes the guarantee "that all persons have a natural right to life, liberty, the pursuit of happiness, and the enjoyment of the rewards of their own industry." Relying on this provision's affirmative grant of the right to "liberty," the supreme court held that the state was barred from regulating the hairstyle of a public school student, absent compelling justification. Of the right to liberty, the court said:

> [T]he term "liberty" is an elusive concept, incapable of definitive, comprehensive explication. Yet at the core of this concept is the notion of total personal immunity from governmental control: the right "to be let alone."

*Id.* at 168.

In several other cases, the Alaska Supreme Court has considered article I, § 22 of the Alaska Constitution, which specifies that "[t]he right of the people to privacy is recognized and shall not be infringed." Our constitutional right to privacy finds no express counterpart in the federal constitution and has thus served as the basis for extending protections to Alaska citizens that are not extended under the United States Constitution. *See, e.g., State v. Glass,* 583 P.2d 872 (Alaska 1978) (holding that the right to privacy requires that a

search warrant be obtained before police surreptitiously engage in electronic recording of a conversation, even when one of the parties to the conversation consents to the monitoring); *Ravin v. State*, 537 P.2d 494 (Alaska 1975) (the right to privacy precludes imposition of criminal sanctions for possession of small quantities of marijuana for personal consumption in the home).

The Alaska Constitution's unique concern with the rights to liberty and privacy, and the Alaska Supreme Court's vigilant enforcement of these rights, have a strong bearing on the manner in which interpretation of Alaska's privilege against self-incrimination should be approached. For it has long been recognized that the privilege against self-incrimination "reflects a complex of our fundamental values and aspirations." *Kastigar v. United States*, 406 U.S. at 444, 92 S.Ct. at 1656. Among these fundamental values is the protection of individual liberty and privacy:

> The privilege against self-incrimination "registers an important advance in the development of our liberty—'one of the great landmarks in man's struggle to make himself civilized.'" It reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; *our sense of fair play which dictates "a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him* and by requiring the government in its contest with the individual to shoulder the entire load[;]" *our respect for the inviolability of the human personality and of the right of each individual "to a private enclave where he may lead a private*

*life* [;]" our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes "a shelter to the guilty," is often "a protection to the innocent."

*Murphy v. Waterfront Commission*, 378 U.S. at 55, 84 S.Ct. at 1596 (citations omitted) (emphasis added).

The foregoing cases, in our view, stand strongly against narrowing article I, § 9 of the Alaska Constitution to permit use and derivative use immunity as a substitute for the privilege against self-incrimination or transactional immunity. These cases are bolstered by decisions from several other states. Hawaii, Oregon, Massachusetts, and Mississippi have all declined to follow *Kastigar*, construing the privilege against self-incrimination contained in their state constitutions to require transactional immunity. *See State v. Miyasaki*, 62 Haw. 269, 614 P.2d 915 (1980); *State v. Soriano*, 68 Or.App. 642, 684 P.2d 1220 (in banc), *summarily aff'd*, 298 Or. 392, 693 P.2d 26 (1984); *Attorney General v. Colleton*, 387 Mass. 790, 444 N.E.2d 915 (Mass.1982); *Wright v. McAdory*, 536 So.2d 897 (Miss. 1988).

As we have already observed, the Hawaii Supreme Court's decision in *State v. Miyasaki* has particular relevance to Alaska because the adoption of the Hawaii Constitution was contemporaneous with the adoption of the Alaska Constitution. Oregon's decision to construe its state constitution to require transactional immunity is also of particular relevance to Alaska because of the closely shared statutory history and legal traditions of the two states. *See generally* Brown, *The Sources of the Alaska and Oregon Codes, Parts I and II*, 2 UCLA–Alaska L.Rev. 15, 87 (1972).

Moreover, the decisions in the four states that have declined to follow *Kastigar* are by far better reasoned and more persuasive than decisions from states following *Kastigar*, which, at best, tend to be conclusory.[8]

---

**8.** The state cites twelve cases for the proposition that the "vast majority of state courts" have elected to follow *Kastigar* in holding use and derivative use immunity coextensive with the privilege against self-incrimination. However,

only four of these cases involve state constitutional issues, and only two of those four cases expressly consider and decide that their state privilege against self-incrimination should not be construed more broadly than the fifth

State cases following *Kastigar* offer no compelling reasons for construing article I, § 9 of the Alaska Constitution more narrowly than its drafters intended.

Lastly, we feel compelled to voice skepticism about the state's position that, with carefully implemented and scrupulously followed procedural safeguards, use and derivative use immunity can provide protections coextensive with those of article I, § 9. Perhaps the strongest argument for the proposition that use and derivative use immunity is coextensive with the privilege against self-incrimination is set forth in Justice White's concurring opinion in *Murphy v. Waterfront Commission*, 378 U.S. at 92, 84 S.Ct. at 1624. The dissenting opinions of Justice Brennan in *Piccirillo v. New York*, 400 U.S. at 552, 91 S.Ct. at 522, and Justices Douglas and Marshall in *Kastigar v. United States*, 406 U.S. at 462, 467, 92 S.Ct. at 1665, 1668, offer equally strong legal arguments for the proposition that only transactional immunity offers coextensive protection. These dissents further set forth compelling reasons why use and derivative use immunity cannot work as a matter of practical reality—whatever its theoretical validity.

We need not rehash the particulars of this familiar debate. For our purposes, it is sufficient to observe that the twenty years of experience since *Kastigar* have provided no clear resolution. No consensus has emerged as to any procedural approach that would allow the theoretical guarantees of use and derivative use immunity to be readily implemented in practice; nor has actual practice served to allay the fears of the dissenters in *Piccirillo* and *Kastigar*.

If the use and derivative use immunity cases since *Kastigar* teach anything, it is that protecting and vindicating the fifth

amendment by requiring transactional immunity. In *Ex Parte Shorthouse*, 640 S.W.2d 924, 928 (Tex. Crim.App.1982) (en banc), the court—relying on a prior decision generally indicating that the Texas Constitution's privilege against self-incrimination provided safeguards similar to the fifth amendment—summarily concluded that the Texas Constitution should not be read more broadly than the fifth amendment with respect to the scope of immunity. In *In re Caito*, 459 N.E.2d 1179 (Ind. 1984), the supreme court of Indiana considered a claim that Indiana's witness immunity statute was deficient because it offered only use immunity, and not use and derivative use immunity. The court rejected the claim, interpreting the statute to provide for use and derivative use immunity. Although the sufficiency of use and derivative use immunity was not challenged, and no state constitutional issue was raised, the court, citing *Kastigar* and *Murphy v. Waterfront Commission*, summarily concluded that use and derivative use immunity was sufficient under both the fifth amendment and the Indiana Constitution's privilege against self-incrimination. *In re Caito*, 459 N.E.2d at 1184.

In *Patchell v. State*, 711 P.2d 647 (Ariz.App. 1985), the court held that use and derivative use immunity was not barred by a provision of the state constitution requiring transactional immunity for certain categories of cases; the court declined to read that constitutional provision as implicitly requiring transactional immunity in all categories of cases. The court gave no consideration to the issue of whether Arizona's privilege against self-incrimination should be read more broadly than the fifth amendment, apparently assuming that it should not. In *State v. Strong*, 110 N.J. 583, 542 A.2d 866 (1988), the court, applying a state use and derivative use immunity statute, construed New Jersey's privilege against self-incrimination more broadly than the fifth amendment by holding the clear and convincing evidence standard applicable to the prosecution's burden of proving that a post-immunity prosecution did not involve tainted evidence. *Id.* at 878. No claim was raised that use and derivative use immunity was deficient, and the court did not discuss the issue.

None of the remaining eight cases cited by the state considers use and derivative use immunity in the context of a state privilege against self-incrimination. Two cases, *Brooks v. State*, 238 Ga. 435, 233 S.E.2d 208 (1977), and *People v. Smith*, 102 Ill.App.3d 226, 57 Ill.Dec. 753, 429 N.E.2d 870 (1981), merely rely on *Murphy v. Waterfront Commission* to reject claims that a state grant of use and derivative use immunity is deficient because it fails to protect against federal prosecution. The other six cases involve no challenge to the adequacy of use and derivative use immunity; instead, they are simply cases in which state courts have applied or expressed approval of use and derivative use immunity, based on *Kastigar*, with no consideration as to whether transactional immunity should be required on state grounds. *See Daly v. Superior Court*, 19 Cal.3d 132, 137 Cal.Rptr. 14, 560 P.2d 1193, 1200 (1977) (in bank); *State v. Durrant*, 244 Kan. 522, 769 P.2d 1174 (1989); *Gandy v. State*, 96 Nev. 281, 607 P.2d 581 (1980); *State v. Munoz*, 103 N.M. 40, 702 P.2d 985 (1985); *State v. Sinito*, 43 Ohio St.2d 98, 330 N.E.2d 896 (1975); *In re Investigating Grand Jury*, 495 Pa. 186, 433 A.2d 5 (1981).

amendment rights of a person prosecuted after receiving a grant of use and derivative use immunity will often be possible only after complex and protracted litigation at both the trial and appellate levels. *See, e.g., United States v. North*, 910 F.2d 843 (D.C.Cir.1990); *State v. Munoz*, 103 N.M. 40, 702 P.2d 985 (1985). Yet the privilege against self-incrimination protects against more than the danger of a final conviction; it extends to the danger of prosecution itself, operating whenever a witness "is asked to incriminate himself—in other words, to give testimony which may possibly expose him to a criminal charge." *Hale v. Henkel*, 201 U.S. 43, 67, 26 S.Ct. 370, 376, 50 L.Ed. 652 (1906). More broadly put, the privilege "protects against threats to personal liberty without regard to nice distinctions between forms of action." *E.L.L. v. State*, 572 P.2d 786, 789 (Alaska 1977) (Matthews, J., dissenting).

One whose rights under article I, § 9 of the Alaska Constitution are vindicated only after trial and conviction, incarceration pending appeal, and protracted and costly appellate proceedings is hardly in substantially the same position as if no prosecution had been allowed in the first instance. To a person faced with use and derivative use immunity, the apprehension that testimony compelled under that immunity may result in trial, conviction, incarceration, and protracted appellate litigation is neither unreal nor insubstantial. It is a sufficient apprehension to trigger the protections of the constitutional privilege. *See McConkey v. State*, 504 P.2d 823, 825–26 (Alaska 1972).

Moreover, even if use and derivative use immunity were realistically capable of being implemented by fair, effective, and readily enforced procedural safeguards, the substitution of use and derivative use immunity for transactional immunity—or for the protections of the privilege—would remain problematic. In a somewhat different context, the United States Supreme Court has observed: "There is always in litigation a margin of error, representing error in factfinding, which both parties must take into account." *Speiser v. Randall*, 357 U.S. 513, 525, 78 S.Ct. 1332, 1341, 2 L.Ed.2d 1460 (1958).

[This] possibility of mistaken factfinding—inherent in all litigation—will create the danger that the legitimate utterance will be penalized. . . . This is especially to be feared when the complexity of the proofs and the generality of the standards applied provide but shifting sands on which the litigant must maintain his position.

*Id.* at 526, 78 S.Ct. at 1342 (citation omitted).

Recognition of the inherent unreliability of the fact finding process has figured prominently in the criticism of use and derivative use immunity. *See Kastigar v. United States*, 406 U.S. at 468–69, 92 S.Ct. at 1668–69 (Marshall, J., dissenting); *Piccirillo v. New York*, 400 U.S. at 567–68, 91 S.Ct. at 530–31 (Brennan, J., dissenting). This criticism—which has never been adequately answered—cannot be ignored or simply dismissed.

The procedures that have been adopted to implement use and derivative use immunity illustrate the problem. Virtually all of the federal courts dealing with use and derivative use immunity have adopted preponderance of the evidence as the standard that governs the state's burden of proving lack of taint when it prosecutes a previously immunized witness. *See United States v. North*, 910 F.2d at 854. A minority of courts—particularly solicitous of individual liberties—have adopted the clear and convincing evidence standard. *See, e.g., State v. Strong*, 110 N.J. 583, 542 A.2d 866, 872 (1988). Under either standard, the prosecution's improper use of immunized testimony will not require reversal of a conviction if the impropriety is found to be harmless beyond a reasonable doubt. *See United States v. North*, 910 F.2d at 854. And trial court rulings on issues of immunity are subject to reversal only if clearly erroneous. *Id.* at 855.

Each of these procedural standards builds in slippage reflecting the inherent and unavoidable unreliability of the process by which use and derivative use immunity is converted from theory to actuality. The real life consequences should be readily apparent: a person granted use and deriva-

tive use immunity is forced to exchange the certainty of reliance on the privilege, or the relative certainty of transactional immunity's categorical bar against subsequent prosecution, for the mere probability—or, at best, clear probability—that compelled testimony or its fruits will not be used in the event of a subsequent prosecution.

If we are to take seriously—as we believe we must—the notion that a valid grant of immunity must be coextensive with the protections of the privilege against self-incrimination, then it is difficult to see how a mere probability that compelled testimony has not been used in securing a conviction can realistically be equated with the certainty that such testimony can never be used. To argue, as does the state, that procedural safeguards can be adopted to make use and derivative use immunity coextensive seems roughly comparable to arguing that, through diligent effort and scrupulous adherence to the rules of criminal procedure, the preponderance of evidence standard can become the equivalent of, and a constitutionally acceptable substitute for, the requirement of proof beyond a reasonable doubt in a criminal case.[9]

## CONCLUSION

In summary, we have found that the drafters of article I, § 9 of the Alaska Constitution intended the privilege against self-incrimination to be supplanted only by a grant of transactional immunity. The state has failed to advance any sound reason to depart from the originally intended scope of the privilege. Examination of Alaska's case law and the case law of our sister states bolsters the conclusion that a narrowing of article I, § 9 would be inappropriate. Examining the case law that has emerged during the twenty years since *Kastigar*, we find little to recommend a narrow reading of Alaska's constitutional privilege and much to recommend against it. We thus conclude that only a grant of transactional immunity[10] will meet the requirements of article I, § 9.

"Nothing new can be put into the Constitution except through the amendatory process. Nothing old can be taken out without the same process." *Ullmann v. United States*, 350 U.S. at 428, 76 S.Ct. at 501. Accordingly, Alaska's witness immunity statute, AS 12.50.101, must be held insufficient to overcome an otherwise valid claim of privilege.

We AFFIRM the superior court's order.

MANNHEIMER, J., not participating.

**9.** The state argues that, under the peculiar circumstances of the present case, which involves a grant of immunity extended after Jill Jahnke–Leland has already been tried and convicted, procedural safeguards are readily available to protect Jahnke–Leland from any realistic possibility that her testimony might be used against her in any future prosecution. Based on the likelihood that use and derivative use immunity could be implemented in a trouble-free manner under the circumstances of the present case, the state asks us to construe article I, § 9 to allow use and derivative use immunity. This approach places the cart of expediency squarely before the constitutional horse. There is merit to the state's contention that cases like the present one are among the most suitable for application of the use and derivative use immunity standard. *See, e.g.,* Note, *Standards for Exclusion in Immunity Cases after Kastigar and Zicarelli,* 82 Yale L.J. 171, 181–87 (1972). However, the existence of a limited category of cases in which use and derivative use immunity could be applied with relatively little trouble is not a compelling justification for departing from the intent of the drafters of article I, § 9 of the Alaska Constitution.

**10.** Under the United States Supreme Court's decision in *Murphy v. Waterfront Commission,* it is clear that a state grant of immunity to Jill Jahnke–Leland—whether transactional or use and derivative use immunity—would protect Jahnke–Leland in any federal prosecution against use or derivative use of her compelled testimony. It is at least arguable, however, that, to meet the requirements of the Alaska Constitution, a grant of immunity would be required to provide transactional immunity from both state and federal prosecution. *See Surina v. Buckalew,* 629 P.2d at 980. The parties to the present case, however, have neither raised nor briefed this issue, and from the facts it appears that Jill Jahnke–Leland stands in no realistic danger of federal prosecution in connection with the incident as to which her testimony has been sought. For these reasons, we find it unnecessary, at this juncture, to address the issue.